# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2537
No. 98-2538

_____

| | |
|---|---|
| Kristen Dhyne, | * |
| | * |
| Plaintiff - Appellant/ | * |
| Cross Appellee, | * |
| | *  Appeal from the United States |
| v. | *  District Court for the |
| | *  Western District of Missouri. |
| Meiners Thriftway, Inc., | * |
| | * |
| Defendant - Appellee/ | * |
| Cross Appellant. | * |

_____

Submitted: February 10, 1999

Filed: July 21, 1999

_____

Before WOLLMAN,[*] LOKEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

LOKEN, Circuit Judge.

Kristen Dhyne sued her former employer, Meiners Thriftway, Inc. ("Meiners"), asserting claims of co-worker sexual harassment and retaliation discrimination in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*, and the Missouri Human Rights Act

_____

[*]Roger L. Wollman became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 24, 1999.

("MHRA"), Mo. Rev. Stat. §§ 213.010 *et seq*. After a jury trial, the district court[1] granted judgment as a matter of law dismissing Dhyne's claims for punitive damages and retaliation. The jury awarded Dhyne $1.00 in nominal compensatory damages on her claim for hostile work environment sexual harassment. Dhyne appeals the district court's refusal to submit punitive damages and retaliation to the jury. Meiners cross-appeals the court's refusal to grant judgment as a matter of law on the sexual harassment claim. Each party appeals an evidentiary ruling. We affirm.

## I. Sexual Harassment Issues.

Dhyne worked as a checker at the Meiners family-owned grocery store in Kansas City from mid-March to late October 1996. For the first three months of that period, Dhyne alleges that a young African-American grocery sacker, Rodney Davis, subjected her to quiet but persistent sexual harassment and abuse. Davis denied harassing Dhyne and accused her of making racially motivated complaints. Dhyne argues the harassment was so severe and Meiners's response so inadequate that she deserves punitive damages. Meiners argues that, by transferring Davis to a different shift, it handled a difficult situation so well that it deserves judgment as a matter of law. The jury's $1.00 verdict suggests that it did not fully credit either side's evidence.

**A. The Evidence at Trial.** Dhyne was the first of eleven witnesses in the two-day trial. She testified that during her first week as a checker, Davis began a campaign of quiet but offensive sexual harassment. According to Dhyne, the campaign included calling her offensive names such as "bitch," "whore," and "slut," commenting crudely on parts of her body, making sexual moaning noises, asking if she tanned in the nude, inviting her to perform oral sex, and ignoring her repeated requests to stop the harassment. In April, Dhyne complained to assistant manager Tom Watson, who

---

[1]The HONORABLE FERNANDO J. GAITAN, JR., United States District Judge for the Western District of Missouri.

assured her he would speak to Davis. Within a week of that complaint, Dhyne told Watson that Davis was continuing to harass, and Watson said he would again speak to Davis. Rather than improve, Davis's conduct worsened -- he began pinching Dhyne's arm, brushing her behind, and lifting the legs of her shorts.

In early June, Dhyne again complained to Watson, accompanied by Stacy Napier, a checker who had previously complained of inappropriate conduct by Davis. Watson responded he had recommended Davis be fired. A few days later, after seeking help from an attorney, Dhyne complained of the continuing harassment to Dan Meiners, director of store operations. Meiners said he would speak to Davis. On June 12, a tearful Dhyne told Watson and then Meiners that Davis's harassment was continuing. Meiners immediately transferred Davis to the night shift, where he had no contact with Dhyne. The night shift manager fired Davis later in June, but he was rehired in September on a different shift than Dhyne worked. She questioned his being rehired but made no further complaints of sexual harassment.

Five other present and former non-supervisory employees testified at the trial, including three checkers and one sacker, Eric Norton. None heard or saw Davis direct sexually offensive comments or actions toward Dhyne. Napier testified that she encouraged Dhyne to complain to management because, when Davis had previously made sexually offensive and derogatory comments to Napier, she complained to Dan Meiners, and Davis promptly apologized and never harassed Napier again. All of these witnesses described Dhyne as a difficult and divisive co-worker.

Assistant Manager Watson testified that Dhyne repeatedly complained of sexual harassment by Davis between April and mid-June 1996. Watson said he confronted Davis after each complaint. Davis denied harassing Dhyne. Watson "told him if this is happening, you better cut it out or you'll lose your job." After Dhyne's third complaint, Watson talked to Dan Meiners. After the fourth complaint, Watson recommended to Meiners that Davis be fired.

Dan Meiners testified that, when Dhyne first complained to him of sexual harassment, he warned Davis that harassing behavior would not be tolerated. Davis denied the allegations, adding that Dhyne had something against him. On June 12, when Dhyne complained that the harassment was continuing, Meiners decided to fire Davis. He confronted Davis, who not only denied Dhyne's allegations but also told Meiners that Dhyne's complaints were racially motivated. Faced with that dilemma, Meiners testified that he instead transferred Davis to the night shift where he would have no further contact with Dhyne. Four days later, Davis was fired for failing to report to the night shift. He was rehired in late September to work an evening shift that did not overlap the shift worked by Dhyne.

**B.  The Legal Environment.** "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). The Supreme Court recently discussed at length an employer's vicarious liability for a hostile work environment created by a supervisor. See Burlington Ind., Inc. v. Ellerth, 118 S. Ct. 2257 (1998); Faragher v. City of Boca Raton, 118 S. Ct. 2275 (1998). This is a different type of case because it involves harassment by a non-supervisory co-worker. Our court has long recognized that an employer may be *directly* liable for such harassment if it knew or should have known of the conduct and failed to take proper remedial action. See Callanan v. Runyun, 75 F.3d 1293, 1296 (8th Cir. 1996); Hall v. Gus Constr. Co., 842 F.2d 1010, 1015-16 (8th Cir. 1988).

In 1991, Congress amended Title VII to provide for punitive damages if a private employer engages in intentional, unlawful discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The Supreme Court recently clarified the standard for awards of punitive damages under this statute. It "provides for punitive awards based solely on an employer's state of mind. . . . The terms 'malice' or 'reckless indifference' pertain

-4-

to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad v. American Dental Ass'n, 1999 WL 407481, at *6 (U.S. Jun. 22, 1999).

**C.  Meiners's Claim for Judgment as a Matter of Law.**  Meiners appeals the district court's denial of judgment as a matter of law on Dhyne's hostile work environment claim, arguing that it took prompt remedial action reasonably calculated to end the harassment.[2]  This is a close question.  Dan Meiners effectively remedied the situation in mid-June when he transferred Davis to another shift.  The problem with this remedial action is Meiners's delay in taking it.  In many cases, the requirement that an employer properly remedy co-worker sexual harassment must tolerate some delay. Here, for example, Davis denied the alleged harassment, and no other employee corroborated Dhyne's complaints of verbal rather than physical harassment.  An employer must be allowed some time to gauge the credibility of the complainant and the seriousness of the situation if we are to observe the Supreme Court's caution that Title VII is not "a general civility code for the American workplace."  Oncale v. Sundowner Offshore Servs., Inc., 118 S. Ct. 998, 1002 (1998).  Nonetheless, there was evidence of unacceptable delay.  Assistant Manager Watson testified that he had the authority to hire and fire.  A reasonable jury could find that Watson should not have delayed two months before taking effective action himself or bringing Dhyne's repeated complaints to Dan Meiners's attention.  Because Dhyne sought only damages, the jury's one dollar nominal award was in essence a verdict in favor of Meiners.  The district court did not err in upholding that verdict.

---

[2]Meiners also appeals the denial of its pretrial motion for summary judgment on this issue.  "A ruling by a district court denying summary judgment is interlocutory in nature and not appealable after a full trial on the merits."  Metropolitan Life Ins. Co. v. Golden Triangle, 121 F.3d 351, 354 (8th Cir. 1997).  We instead review the denial of judgment as a matter of law giving the verdict a deferential standard of review.  See Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co., 19 F.3d 431, 434-35 (8th Cir. 1994).

**D. Dhyne's Claim for Punitive Damages.** Dhyne argues the district court should have submitted her punitive damages claim to the jury. We disagree. There was no evidence suggesting evil motive or an intentional violation of federal law by the Meiners management. Watson credited Dhyne's complaints. Though he failed to remedy the situation, he warned Davis to behave and eventually urged that Davis be fired. Dan Meiners responded decisively when Dhyne complained to him in June 1996. The Meiners management may have excessively delayed, but it was not guilty of acting "with malice or with reckless indifference." See Varner v. National Super Markets, Inc., 94 F.3d 1209, 1214 (8th Cir. 1996), cert. denied, 519 U.S. 1110 (1997). Likewise, Meiners's conduct was not "outrageous because of [its] evil motive or reckless indifference to the rights of others," the punitive damages standard under the MHRA. Burnett v. Griffith, 769 S.W.2d 780, 789 (Mo. banc 1989).

## II. The Retaliation Claim.

Both Title VII and the MHRA prohibit retaliation against employees who complain of discrimination. See 42 U.S.C. § 2000e-3(a); Mo. Rev. Stat. § 213.070. Dhyne argues the district court erred in dismissing her claim that she was terminated on October 24, 1996, in retaliation for her complaints of sexual harassment. We review de novo the district court's grant of judgment as a matter of law, applying the same standard used by the district court. See Manning v. Metropolitan Life Ins. Co., 127 F.3d 686, 689 (8th Cir. 1997). Judgment as a matter of law is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the non-moving party. FED. R. CIV. P. 50(a)(1). When the parties have developed a full trial record, we are not concerned with plaintiff's prima facie case. "What is relevant, at this point, is simply whether the plaintiff's evidence permits a reasonable inference of discrimination." Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1100 (8th Cir. 1988).

-6-

Dan Meiners testified that he saw Dhyne take deli food and a drink into the break room without paying for it during a mid-day break. Meiners instructed Watson to wait until Dhyne left the store after her shift, verify whether she paid for the food, and terminate her if she did not. When Dhyne left the store that afternoon, Watson confirmed she had not paid for any food that day, caught up with her outside the store, and terminated her for taking food without paying for it. At trial, Dhyne denied eating any food that day except a donut before her shift began. Watson testified that when he confronted Dhyne outside the store, she first said she forgot to pay for the lunch.

Dhyne introduced virtually no evidence linking the termination to her earlier complaints of harassment. Her last sexual harassment complaint occurred in mid-June; she was terminated in late October. Standing alone, a four-month gap "weakens the inference of retaliation that arises when a retaliatory act occurs shortly after a complaint." Smith v. St. Louis Univ., 109 F.3d 1261, 1266 (8th Cir. 1997). Here, the time gap is reinforced by other undisputed evidence refuting any inference of a causal link. In mid-June, Meiners responded to Dhyne's complaints by transferring and then firing Davis, while Dhyne was neither criticized nor disciplined. Dhyne responds that she was disciplined unfairly and denied favorable treatment in several ways after June 1996. But no other witness supported her claims of disparate treatment, and all her co-workers testified that Dhyne was a persistently troublesome employee. Thus, her conclusory, unsupported assertions that she was treated unfairly do not raise an inference of retaliation discrimination. See Feltmann v. Sieben, 108 F.3d 970, 976 (8th Cir. 1997), cert. denied, 118 S. Ct. 851 (1998).

By contrast, Meiners articulated a legitimate, nonretaliatory reason for Dhyne's termination -- she violated a company rule that employees must pay for food they eat on the job -- and Dhyne failed to prove this stated reason for discharge was pretextual. Dhyne denied eating food without paying for it that day. But Dhyne's denial standing alone is not evidence Dan Meiners *fabricated* the charge. Even if Meiners was

-7-

mistaken, a number of witnesses corroborated his testimony that he tried to verify whether Dhyne had eaten food without paying for it. Dhyne further accuses Meiners of changing his story at trial by advancing her poor work performance as an additional reason for the termination. But many employees testified that Dhyne became an increasingly difficult and divisive presence in the work force after Meiners remedied her complaints of sexual harassment. Meiners would not be the first employer to terminate an unsatisfactory employee for committing an infraction that might be tolerated in others. The food incident on October 24 may well have been, in colloquial parlance, "the straw that broke the camel's back." That does not prove this stated reason for discharge was a pretext *for retaliation discrimination*. Compare Rath v. Selection Research, Inc., 978 F.2d 1087, 1089-90 (8th Cir. 1992).

### III.  Evidentiary Issues.

**A.**  Dhyne argues the district court erred in refusing to allow her to read Dan Meiners's deposition testimony into evidence during her case in chief. Meiners was available to testify. Dhyne declined to call him as a live witness, and he testified as a witness for the defense. Dhyne argues the court's ruling violated Rule 32(a)(2) of the Federal Rules of Civil Procedure, which provides that the deposition of a party's corporate officer "may be used by an adverse party for any purpose."

Many trial judges require that a deposed witness testify live, if available. The reason for the practice is clear:

> Judge Learned Hand proclaimed the deposition to be "second best, not to be used when the original is at hand." If possible, it is always better if the jury can observe the witness firsthand to judge his or her demeanor.

-8-

Loinaz v. EG&G, Inc., 910 F.2d 1, 8 (1st Cir. 1990); see 8 WRIGHT, MILLER & MARCUS, FEDERAL PRACTICE & PROCEDURE § 2142 (1994). The practice cannot possibly cause unfair prejudice, because the party wishing to use deposition testimony can call the adverse witness live, impeach him with the deposition if necessary, and even question the witness using the exact same questions asked at the deposition. Thus, though arguably inconsistent with the language of Rule 32(a)(2), precluding a party from reading the deposition testimony of an available adverse party witness is at worst harmless error. See Crimm v. Missouri Pac. R.R., 750 F.2d 703, 709 (8th Cir. 1984). Dhyne suggests the practice is reversible error in Missouri state courts, citing Henson v. Washington School Dist., 948 S.W.2d 202, 210-11 (Mo. App. 1997). However, federal law governs this procedural issue.

**B.** Meiners argues the district court abused its discretion by excluding personnel records from three other employers that allegedly evidence Dhyne's chronic inability to cooperate with her co-workers. See E. I. du Pont de Nemours & Co. v. Berkley & Co., 620 F.2d 1247, 1272 (8th Cir. 1980) (standard of review). Meiners offered this evidence to show that Dhyne's termination was not a pretext for retaliation discrimination. We decline to consider this issue. As Meiners has prevailed on the retaliation claim, any evidentiary error was obviously harmless.

The judgment of the district court is affirmed. The costs of appeal are taxed against appellant Dhyne. See F.R.A.P. 39(a).

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.

I concur in all of the court's opinion except the portion of it that upholds the district court's decision not to submit Ms. Dhyne's retaliation claim to the jury. With respect, I cannot agree with the court that no reasonable person could have found on

this record that Mr. Meiners discharged Ms. Dhyne in retaliation for making a complaint about Mr. Davis's behavior.

In order to raise an inference that an improper motive animated an employment action, all that a plaintiff has to produce is evidence that the defendant's professed motive was pretextual, that is, falsely professed. See Ryther v. KARE 11, 108 F.3d 832 (8th Cir. 1997) (en banc), cert. denied, 521 U.S. 1119 (1997). Here, there was evidence, in the form of Ms. Dhyne's testimony, that the act on which Mr. Meiners said he based his decision to fire Ms. Dhyne never in fact occurred. It seems to me inescapable that a reasonable person who believed Ms. Dhyne could infer that Mr. Meiners fabricated his motive for terminating Ms. Dhyne's employment. The inference itself is hardly inescapable, but it is permissible.

The court alludes to testimony from witnesses that corroborated Mr. Meiners's testimony that he tried to verify when Ms. Dhyne had eaten food without paying for it. But, in the first place, the court does not indicate that there was any evidence that in fact tended to show that Ms. Dhyne acted in the way that Mr. Meiners claimed. More fundamentally, even if there was such testimony, the jury would be free to disbelieve it, leaving intact the inference that Mr. Meiners was not telling the truth. That inference would be sufficiently strong to carry the day for Ms. Dhyne. Cf. Kniebert v. Thomson Newspapers, Michigan, Inc., 129 F.3d 444, 456 (1997) (Morris Sheppard Arnold, dissenting).

When one adds to the factual mix the evidence that Mr. Meiners changed his story about why he terminated Ms. Dhyne, it is hard to resist the conclusion that an inference is raised that Mr. Meiners was not telling the truth. The court's discussion certainly makes out an excellent case for Mr. Meiners, but in the end all it does is summarize the evidence in a light most favorable to him. It might well be that a verdict for Ms. Dhyne on this point would have been surprising; indeed, it would have

surprised me.  But the jury was, on this record, entitled to have the case, and believe whatever proof seemed to it to be entitled to credit.

I therefore respectfully dissent from the court's decision with respect to Ms. Dhyne's retaliation claim.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.