# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

--------------

No. 99-2769

--------------

Lora Stuart,                                              *
                                                         *
    Appellant,                       *
                                                         *  Appeal from the United States
    v.                               *  District Court for the
                                                         *  Eastern District of Missouri
General Motors Corp.,                                    *
                                                         *
    Appellee.                        *

--------------

Submitted: April 12, 2000
Filed: June 26 , 2000

--------------

Before:    BOWMAN and HANSEN, Circuit Judges, and
           CARMAN,[1] Chief Judge of the U.S. Court of International Trade.

--------------

CARMAN, Chief Judge:

    In 1997, Lora Stuart (Stuart) sued her former employer, General Motors Corporation (GMC),[2] asserting claims of a sexually hostile work environment,

---

    [1]   The Honorable Gregory W. Carman, Chief Judge, United States Court of International Trade, sitting by designation.

    [2]   Pursuant to an arbitrator's decision of December 30, 1998, Lora Stuart (Stuart) was ordered reinstated.

retaliation by discipline,[3] and retaliation by termination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e-2000e-17 (1994), and the Missouri Human Rights Act (MHRA), MO. REV. STAT. §§ 213.055(1) (1996). The District Court for the Eastern District of Missouri (Limbaugh, J.) granted summary judgment to GMC on all claims. Stuart appeals the district court's grant of summary judgment as well as a discovery ruling. We affirm.

I. PROCEDURAL HISTORY

Stuart was terminated from GMC on January 9, 1997. On March 7, 1997, Stuart timely filed administrative charges with the Missouri Commission on Human Rights (MCHR) and the Equal Employment Opportunity Commission (EEOC). In her Charge of Discrimination to both the EEOC and the MCHR, Stuart stated:

> I worked for the company for over 11 years. The last position I held was journeyman electrician. I was harassed and sexually harassed. In July 1996, I filed a grievance for sexual harassment. I was told that the company would "take me to termination" for the filing the grievance. On January 7 [*sic*], 1997, I was terminated.
>
> I was told that I was being terminated because I was observed, at work, participating in an indecent act.
>
> I believe that I have been discriminated against by being harassed and sexually harassed because of my sex, female, and that I was terminated in retaliation for filing a grievance on the sexual harassment.

---

[3] In her complaint, Stuart distinguishes between two forms of alleged retaliation, retaliation by termination and retaliation by disciplinary actions taken against her as part of a progressive disciplinary scheme. For the purposes of this action, this Court will refer to the latter form of alleged retaliation as "retaliation by discipline."

On or about October 10, 1997, Stuart received a right to sue letter, and on October 17, 1997, Stuart filed a complaint against GMC in the Eastern District of Missouri complaining of a sexually hostile work environment, retaliation by discipline, and retaliation by termination by GMC in violation of Title VII, and in violation of the MHRA. In her complaint, Stuart alleged she was "subjected to unwelcome and offensive sexual remarks and conduct by male foremen and by male co-workers and was treated differently and denied the same privileges as her male co-workers." She further alleged that after complaining to GMC about the "aforesaid unwelcome sexual remarks and conduct, and fil[ing] a complaint about the hostile work environment," she was retaliated against. The alleged retaliation included issuing "unwarranted and unjustified" disciplinary actions that were part an "unfair and discriminatory" scheme of "progressive discipline," and "terminating plaintiff's employment based on false and unsupported allegations of misconduct."

The district court granted summary judgment to GMC on all claims. The court concluded Stuart failed to exhaust her administrative remedies relating to her action for retaliation by discipline because that claim was neither specified nor alluded to in her EEOC charge. The Court also concluded Stuart failed to establish a *prima facie* case for retaliation by termination, failed to prove the proffered reasons for her discharge were a pretext for retaliation, and failed to establish a *prima facie* case of sexually hostile work environment. The court denied Stuart's motion to compel GMC to answer certain discovery questions.

## II. BACKGROUND

Stuart commenced employment at GMC's Wentzville, Missouri plant in April 1985. Stuart worked at GMC as an electrician intermittently from 1985 and continuously from January 3, 1994. During her tenure at GMC, Stuart complained about sexual harassment and discrimination. On January 9, 1997, Stuart was

terminated for allegedly engaging in an indecent act with a co-worker while at work.

A.     <u>Stuart's Complaints of Sexual Discrimination and a Sexually Hostile Work Environment</u>

On July 14, 1996, Stuart complained to her supervisor, Dave Murphree (Murphree), that she was being treated differently because male employees were allowed longer breaks than female employees. Stuart complained shortly after Murphree ordered her to return to work after what she claims was only a fifteen minute break. Stuart also requested that a call be placed to her union representative.

On July 15, 1996, Stuart reiterated her complaint of discrimination to her union representative, Sam Markovich (Markovich). Stuart also complained to Markovich about sexual harassment at GMC, pointing to the presence of a computer in her work area that contained a pornographic computer program.

Later on July 15, in response to Stuart's complaint, Markovitch notified several union representatives about the computer program, and a GMC manager, and an electrician, among others, were then notified in turn. Stuart showed various GMC and union representatives the pornographic program. Stuart also told Timothy Flavin (Flavin), the Supervisor of Labor Relations at the Wentzville plant, that a number of employees knew of the program and used it, specifically mentioning Murphree. She stated the reason why she was coming forward now[4]

_____

[4]     The pornographic computer program was installed in a computer delivered in 1990 to Stuart's work area. Once, at some unspecified time before July 15, 1996, Stuart had to enter the room where the computer was located to get some tools and found the door locked. "Put off" by the situation, she went to Steve North (North) (her foreman), Don Bockerstick (North's supervisor), and Russ Clinton (an old supervisor of Stuart) and said "something to the effect if they

with the information was because "of the way her supervisor (Dave Murphree) talked to her -- which was without respect."

After being informed about the pornographic computer program, Steve Schwartz (Schwartz), a supervisor, offered to move Stuart to another area of the plant still in a position as an electrician. Stuart declined the offer. Also, in response to Stuart's complaint, on July 15, 1996, Michael Camp (Camp), the plant manager, directed Alfred Moellenhoff (Moellenhoff), GMC's Equal Employment Opportunity Coordinator, to dedicate his entire work effort into investigating the computer program. Camp also instructed Kevin Runge, a member of GMC's computer operation, to immediately remove the computer in question. Less than a week later, GMC sent Gary Koegelman to the Wentzville plant to inspect every stand-alone computer at the facility to ensure that no other pornographic programs had been installed. Moellenhoff ended up spending more than a week investigating Stuart's complaint. He interviewed at least thirty employees and informed Stuart three times of the investigation's status. At the end of his investigation, Moellenhoff determined the program originated with Fred Dechert (Dechert), a GMC employee, who was on extended disability leave and could not be interviewed. As Dechert retired without returning to work, he could not be disciplined by GMC. In early August, GMC sent a pamphlet describing its sexual harassment policy and a letter to all its employees notifying them of the sexual harassment policy at GMC.

Finally, on July 20, 1996, Stuart complained to Flavin about pornographic

---

can play – their little boy games on the computer and have that in there, I can at least get in there to get my tools." None of the individuals asked what Stuart meant by "boy games," nor did Stuart explain what she meant by the term. Stuart was promised the combination to the room and did not comment further about the computer or the incident until July 1996. Stuart makes no allegations regarding whether and how often she was subjected to viewing the pornographic images.

photographs that had been found in her locker.[5] At some unspecified time prior to July 29, 1996, Moellenhoff investigated the pictures. Because they had been touched by too many individuals, it was determined that fingerprint analysis would be futile.

In her papers before the district court, Stuart elaborated on how her work environment was sexually hostile. Stuart alleged, although she did not directly mention the incidents in her complaint, that her male co-workers routinely commented she had PMS, or had not had sex for a month. Additionally, "offensive" posters were put on her locker,[6] and male employees, frequently in the presence of supervisors, grabbed their genitals and made "hooh-ha" noises.[7]

---

[5] It is unclear when these photographs were introduced into Stuart's locker. It appears she believes they were introduced while she was suspended, sometime before January 20, 1996.

[6] Prior to July 20, 1996 Timothy Flavin (Flavin) became aware of three posters on Stuart's locker. One poster stated, "It's Not P.M.S. That's Bothering Me . . . It's You!," another stated, "I Have PMS And A Handgun, Any Questions?" and the third had a picture of a canine with its middle finger raised in an offensive manner and the banner "I'm about to develop an attitude." When Stuart returned to work on July 20, 1996, Flavin confronted her about those posters and was concerned another employee posted them in her absence. Stuart indicated to Flavin she knew of the posters and found them funny.

[7] Stuart apparently also complained about being "screamed at" by supervisors Steve Schwartz (Schwartz) and Russ Clinton, and a single occasion when a union representative walked into an unoccupied women's bathroom unannounced. Although these incidents are apparently mentioned in the record Stuart does not appear to have mentioned them in her papers before district court, and does not mention them on appeal.

B.    GMC's Pre-termination Discipline of Stuart

Although not directly at issue in this matter,[8] Stuart alleges the discipline she received between July 14, 1996, and her termination is relevant to her claims of retaliation.  The record indicates that prior to her termination, and after making her initial complaint about sex discrimination, GMC took several disciplinary actions against Stuart.

First, on July 18, 1996, Stuart received a notice of disciplinary action and was suspended for the balance of her shift plus one day for taking "excessive relief" on July 14, 1996, from "approx. 10:00 PM to 10:42 PM" based on observations of her supervisor, Murphree.  Murphree, however, testified he did not know when Stuart began or ended her breaks.

Second, on July 20, 1996, Stuart received a notice of disciplinary action for insubordination and was suspended for the balance of her shift plus three days.  Stuart was cited for "refus[ing] the clear and reasonable order of advisor Murphree" to put an electrical switch in manual and reset the fault.  Murphree described Stuart's failure to act as a willfull violation of his direct order.

Third, on July 27, 1996, Stuart was suspended for the balance of her shift plus one week for being under the influence of drugs or alcohol and in an unsafe condition at work.[9]

_____

[8]    The instances of pre-termination discipline are not directly at issue because we affirm the district court's finding that Stuart failed to administratively exhaust her claim for retaliation by discipline.  The only two claims at issue in this appeal are Stuart's claims of a sexually hostile work environment and retaliation by termination.

[9]    Stuart neither admits nor denies being under the influence.

Fourth, on August 9, 1996, Stuart was given a notice of disciplinary action for being late for work and was suspended for the balance of her shift plus two weeks without pay. Stuart alleges she was only five minutes late.

Fifth, on November 8, 1996, Stuart was suspended for the balance of her shift plus thirty days for tardiness. Stuart was twenty-three minutes late because of "an extreme traffic tie up on [the] Interstate." Over 250 GMC employees were also late that day. A union representative, Dan Cook, confirmed the tie-up with the police. Stuart was given a notice of disciplinary action for "not provid[ing] a reasonable explanation" for her tardiness and because she was "previously councelled [*sic*] concerning . . . being late for work."[10]

C.    Stuart's Termination by GMC

Stuart was terminated from GMC on January 9, 1997, for allegedly engaging in an indecent act with John Barry (Barry) on January 2, 1997. William Andrews (Andrews),[11] an employee of Pinkerton Security, allegedly observed[12] Stuart and Barry engaging in an indecent act on January 2, 1997. In a security

---

[10]    Jim Burlingame (Burlingame), a GMC employee, had similar tardiness problems but was not disciplined on November 8, 1996, despite also being late on November 8, 1996. GMC alleges Burlingame was not disciplined because he had shown "marked improvement on his attendance. [Stuart] did not." Prior to complaining about sexual harassment, Stuart had been disciplined for "overstayed relief" once, but had been found inexcusably late around seven times from the period January 1, 1996 to July 14, 1996, and late but excused some thirty times in that same period.

[11]    William Andrews (Andrews) did not know Stuart and was unaware of her discrimination complaints.

[12]    Stuart testified that immediately prior to the time when she allegedly committed the indecent act she discovered Andrews rummaging through the parts-bin.

report he prepared describing the incident, Andrews wrote that at 2:10 a.m. he observed, for two minutes, two employees, whom he recognized but did not know their names at the time, engaging in what appeared to be a sex act in an advisor's office. According to the report, Andrews notified his superior, Sgt. Trish Miles (Miles), and "described the two employe[e]s to her at which time she stated their names were Laura Stewart [*sic*] and John Barry."

In a deposition taken on January 15, 1999, Andrews testified he and Miles drove around the plant on a scooter looking for the individuals Andrews observed. Three minutes after they began driving, Andrews observed and identified Stuart and Barry. After observing the two, Miles and Andrews went back to Miles's office where she identified the individuals as Barry and Stuart. Andrews did not mention driving around with Miles on a scooter to anyone prior to January 15, 1999.

In the afternoon of January 2, 1997, Stuart reported to work and Steve North (North), Stuart's foreman, told her that Ron Thornley (Thornley), the supervisor in charge of labor relations, wanted to see her. Thornley and North interviewed Stuart, and Thornley told Stuart that a security guard had accused Stuart of committing an indecent act with her co-worker Barry at 2:10 a.m. Stuart responded that she was in North's office at the time of the alleged incident.

Rich Joellenbeck (Joellenbeck), a safety representative from Stuart's union, testified on January 14, 1999, he was in North's office at approximately 2:00 a.m. on January 2, 1997, and had seen Stuart enter North's office between 2:03 - 2:06 a.m. Joellenbeck documented that Stuart left North's office at approximately 2:20 a.m.[13]

---

[13] Steve North (North) testified in his deposition of November 11, 1998, Stuart was in his office at "[a]pproximately" 2:10 a.m., but he "had no reason to

Thornley, who investigated the alleged incident involving Stuart and Barry and was aware at that time of Stuart's complaints of sex discrimination and harassment, suspended Stuart after discussing the incident with her on January 2, 1997. Thornley prepared an incident report based on his investigation. The report noted, "at approximately 2:05 am," Andrews saw, at a distance of approximately 65 feet, a blond-haired female and a male engaging in a sexual act. After observing the activity for approximately 10-15 seconds, Andrews drove his scooter to a location from which he could see the individuals leave the office. After around two minutes, the individuals left the office and "[h]e got a very close and clear view of both their faces and physical characteristics." Andrews "recognized the two as individuals who were employed at the Assembly Center but did not know them by name." The report indicates that at 11:15 a.m. Andrews picked out Stuart and Barry from identification photographs. The report goes on to note Stuart admitted to being with Barry prior to the time in question but denied being "involved in any actions not related to work." Thornley's report omits, however, the apparent time conflict with Andrews's report which indicated the indecent acts occurred at 2:10 a.m., and Stuart's claim she was in North's office at 2:10 a.m.[14] Based on Thornley's report and recommendation, Steve Eastvold (Eastvold), Manager of Industrial Relations at the Wentzville plant, terminated Stuart and Barry.

---

look at [his] watch" to be sure. During Ron Thornley's (Thornley) investigation, North never confirmed Stuart's assertion that she was in his office at 2:10 a.m., but merely told Thornley that Stuart was in his office briefly and then left.

[14] Stuart alleges Thornley did not tell Steve Eastvold that North and Joellenbeck believed Stuart was in North's office by 2:10 a.m. despite the fact that he clearly knew about their beliefs. Thornley testified, however, he was unaware Joellenbeck believed Stuart was in North's office at 2:10 a.m. until one year after the incident occurred. North never specifically mentioned during the investigation what time Stuart was in his office.

D.    Post-termination Proceedings

After she was terminated, Stuart filed a grievance over her discharge which proceeded to arbitration. On December 30, 1998, the arbitrator ordered reinstatement with full back pay. The arbitrator determined GMC did not meet its "burden of establishing beyond a reasonable doubt that [Stuart] engaged in the conduct for which she was terminated." The arbitrator noted, however, his findings "should not be construed as an endorsement of the contention . . . that in discharging [Stuart] management acted in retaliation for an earlier sexual harassment complaint she had advanced . . . it is simply too broad a leap to conclude that management would have concurrently terminated [Barry] solely to accomplish recriminatory action against [Stuart]."

Stuart asserted in an affidavit dated March 24, 1999, she was not offered reinstatement between her termination and the arbitration award reinstating her.[15] Thornley, on the other hand, testified he made an offer of reinstatement to Stuart's union representative, Markovich, but not directly to Stuart, and Markovich rejected the offer.

III. STANDARD OF REVIEW

This Court reviews grants of summary judgment de novo. *See Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 964 (8th Cir. 1999). Summary judgment "is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Floyd v. State of Missouri Dep't of Soc. Serv., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999). This Court reviews

---

[15]    The record indicates that Esther Dean (Dean) and Elbert Moody (Moody), two GMC employees who were fired in 1987 for having sex on the job, were offered reinstatement to settle their discharge grievance.

a district court's refusal to compel discovery for a "gross abuse of discretion" affecting "the fundamental fairness" of the proceedings. *See Pavlik v. Cargill, Inc.*, 9 F.3d 710, 714 (8th Cir. 1993).

## IV. DISCUSSION

We agree with the district court's thorough and well-reasoned opinion, finding Stuart's claims fail as a matter of law. We discuss Stuart's claim of retaliation by discipline first.

A.    <u>Retaliation by Discipline</u>

In order to initiate a claim under Title VII a party must timely file a charge of discrimination with the EEOC and receive a right-to-sue letter. *See Nichols v. American Nat'l Insur. Co.*, 154 F.3d 875, 886 (8th Cir. 1998). To initiate a claim under the MHRA a party must timely file an administrative complaint with MCHR and either adjudicate the claim through the MCHR or obtain a right-to-sue letter. *See Tart v. Hill Behan Lumber Co.*, 31 F.3d 668, 671 (8th Cir. 1994); MO. ANN. STAT. §§ 213.075, 213.111(1) (1996). Exhaustion of administrative remedies entitling a claimant to bring a cause of action, under both statutes, "requires a claimant to give notice of all claims of discrimination in the administrative complaint." *See Tart*, 31 F.3d at 671 (basing holding on cases discussing Title VII). To determine whether an allegedly discriminatory action falls within the scope of a claim, "the administrative complaint must be construed liberally" in order to further the remedial purposes of applicable legislation, *i.e.*, to prohibit unlawful employment practices, and a plaintiff "may seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge." *Nichols*, 154 F.3d at 886-87. The breadth of the civil suit is, therefore, as broad as the scope of any investigation that reasonably could have been expected to result from the initial charge of discrimination. *See Tart*, 31 F.3d at 671.

In the case at hand, Stuart's claim of retaliation by discipline must fail because it is not specifically stated in, grows out of, or is like or reasonably related to the substance of her allegations in her EEOC and MCHR charge. In her EEOC and MCHR charge, Stuart stated she was "terminated in retaliation for filing a grievance on the sexual harassment." The only form of retaliation mentioned is termination. There is no mention in her charge of discrimination of GMC retaliating against her through disciplinary actions taken against her. Furthermore, the retaliation by discipline Stuart alleges is not like or reasonably related to the alleged retaliation by termination. This is so because the disciplinary actions Stuart now alleges were in retaliation for her complaints of sexual harassment concerned insubordination, being under the influence, and tardiness. Stuart was terminated, on the other hand, for allegedly engaging in an indecent act on the job, an event factually distinct from and unrelated to the events that led to GMC's alleged retaliation by discipline. Stuart's allegations regarding the disciplinary actions are, thus, beyond the reach of her claim of retaliation by termination because such allegations were not specified or even alluded to in her EEOC charge. *See Artis v. Francis Howell North Band Booster Ass'n., Inc.*, 161 F.3d 1178, 1183 (8th Cir. 1998) (claim of retaliation in relation to disparate treatment of students not like or reasonably related to complaint of retaliation for filing a grievance related to racial harassment directed at complainant personally); *Tart*, 31 F.3d at 672-73 (disallowing racial harassment claim to be brought in conjunction with a discriminatory discharge claim because incidents supporting each were distinct); *Roxas v. Presentation College*, 90 F.3d 310, 318 n.5 (8th Cir. 1996) (teacher's claim of constructive discharge not like or reasonably related to EEOC claim of discriminatory denial of sabbatical leave). Because her claim of retaliation with respect to the disciplinary actions is not administratively exhausted, the Court will not address the merits of Stuart's claim of retaliation by discipline. Stuart's claim of retaliation by discipline is dismissed, and summary judgment granted to GMC with respect to that claim is affirmed.

B.    Sexually Hostile Work Environment

To establish a claim of a hostile work environment, a claimant must establish (a) she is a member in a protected group; (b) she was subject to unwelcome sexual harassment; (c) the harassment was based on sex; (d) the harassment affected a term, condition, or privilege of employment; and (e) the employer knew or should have known of the harassment and failed to take proper remedial action. *See Scusa*, 181 F.3d at 965. To be actionable, a "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)). When determining whether the alleged conduct rises to the level of prohibited abusiveness, the Court must examine "the circumstances" including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787-88 (quotations and citation omitted). The standards for judging hostility must be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Id.* at 788 (citation omitted).

Stuart contends she was subject to the following harassing conduct: (1) regular comments by male co-workers regarding "PMS" and lack of sexual relations; (2) occasional "saluting" by male co-workers, involving grabbing their genitals and making "hoo-ha" noises; (3) the placement of sexually oriented photographs in her locker on one occasion; (4) the presence of a computer with a pornographic computer program in her general work area;[16] and (5) the placement

_____

[16]    The record indicates the computer also contained "truck stop pornographic" graphics. Stuart never complained about these graphics to GMC management personnel, nor does she mention it in her briefs to this Court. Consequently, this Court will not consider these graphics when considering

of offensive signs by unknown persons on her work locker.[17]

Assuming, *arguendo*, Stuart was a member of a protected class, a reasonable person would consider her subject to unwelcome sexual harassment, and the conduct was based on Stuart's sex, Stuart's claim must fail because Stuart has provided no evidence *she* considered herself subject to unwelcome sexual harassment at any time prior to July 14, 1996, when she first complained to Murphree. *See Faragher*, 524 U.S. at 787 (complainant must show sexual harassment objectively *and* subjectively offensive). Despite her being aware of GMC's policy toward sexual harassment long before 1996, the record indicates Stuart either did not complain about any of the alleged incidents of sexual harassment mentioned in her papers, or did not complain about them after July 14, 1996. Stuart did not complain or otherwise inform GMC supervisors about the "saluting" and offensive comments. Stuart never complained about the "offensive" signs and there is evidence she found them funny. Stuart did not complain about the pornographic photographs in her locker until July 20, 1996, and it appears they were not placed in her locker until the day before. As far as the computer with the pornographic program, Stuart appears to have been aware of it for a long time before she said anything to her union representative on July 15,

---

whether there was a sexually hostile work environment.

[17] Regarding the "screaming" and bathroom incidents mentioned in note 7, *supra*, Stuart does not complain about them on appeal. Nevertheless, even if she had, because Stuart's papers do not indicate she ever complained about the "screaming" or that it had an effect on her employment, this Court will not consider the "screaming" when determining whether there was a sexually hostile work environment. Regarding bathroom incident, Stuart made no allegation that it had an effect on her employment. Furthermore, it appears GMC took prompt remedial action; Moellenhoff met all the female employees in Stuart's group to discuss any concerns they had regarding the incident, and the incident was never repeated. As a result, this Court will not consider the bathroom incident when determining whether there was a sexually hostile work environment.

1996. She never specifically complained to any supervisor about the program by name or noted that its presence made her uncomfortable or interfered with her ability to do her job. Based on Stuart's failure to complain about any of the alleged incidents of sexual harassment mentioned in her papers prior to July 14, 1996, this Court finds Stuart failed to consider herself subject to unwelcome sexual harassment prior to that date.

Stuart's claim also fails because she has not indicated how any of the actions she complained of affected a term, privilege, or condition of her employment. *See Scusa*, 181 F.3d at 967. Based on the evidence, it appears Stuart was able to perform all of her duties and work all shifts unimpeded by the alleged harassment. Indeed, when offered a transfer to a different location because of the alleged harassment, she declined because she "didn't feel the need to."

Finally, Stuart's claim fails because she failed to prove that GMC knew or should have known about the harassment and failed to take prompt and remedial action reasonably calculated to end the harassment. *See Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999). Factors the Court may consider when assessing the reasonableness of GMC's remedial measures include the amount of time elapsed between the notice of harassment, which includes but is not limited to a complaint of sexual harassment, and the remedial action, and the options available to the employer such as employee training sessions, disciplinary action taken against the harasser(s), reprimands in personnel files, and terminations, and whether or not the measures ended the harassment. *See id.*

The Court agrees with the district court that no rational jury could find that GMC's response was neither prompt nor adequate. Stuart appears to have complained only about two incidents of alleged harassment, the computer with the pornographic program and the pornographic photographs in her locker. She complained about those incidents on July 15 and July 20, 1996, respectively.

Although Stuart complains in her court papers that there were "offensive" signs placed on her locker, it appears she never complained to GMC about the signs. It seems that Stuart did not complain to GMC about the other incidents of sexual harassment alleged in her papers, either. Consequently, the Court finds that the only potentially harassing incidents GMC knew or should have known about were the computer and pornographic program and the pornographic pictures. The Court also finds that GMC did not know and cannot be charged with the responsibility of knowing about those incidents until Stuart first complained about them on July 15 and July 20, 1996.

Even assuming, *arguendo*, those incidents satisfy all the other requisite elements of a sexually hostile work environment claim, the Court finds GMC's response to those incidents was prompt and adequate. No more than nine days after Stuart complained about the pornographic pictures in her locker, Moellenhoff went to investigate and determined they could not be fingerprinted to discover who placed them there. Also, it is undisputed, once GMC was notified about the existence of the pornographic computer program, the computer was immediately removed and within days all free-standing and networked computers were checked for pornographic materials. Moellenhoff spent a week interviewing thirty people, most of whom were identified by plaintiff, as to their knowledge of the pornographic program and consulted with Stuart three times. It is undisputed the computer program was installed prior to its delivery to the Wentzville plant and because the man who received the computer with the program, Dechert, was out on medical leave and did not return to work, GMC had no recourse against him. Indeed, GMC attempted but was unable to interview him.

Despite the fact that its sexual harassment policy was posted throughout the plant, GMC took additional steps, after receiving Stuart's complaint, to reiterate its sexual harassment policy. Less than three weeks after Stuart's complaints, GMC sent a letter to all its Wentzville employees explaining its policy on sexual

harassment and included a copy of GMC's employee handbook. GMC also offered Stuart a transfer to a different department as an electrician. Stuart rejected the offer.

Stuart has offered no evidence that raises a genuine issue of material fact as to the adequacy of GMC's remedial measures. Nor does she offer any evidence raising a genuine issue of material fact regarding how the allegedly offensive actions affected a term, condition, or privilege of her employment. Finally, Stuart has not offered any evidence raising a genuine issue of material fact that she considered her work environment to be hostile. Consequently, this Court finds Stuart has failed to make a *prima facie* claim of a sexually hostile work environment. This Court, therefore, affirms the district court's grant of summary judgment for GMC as to this claim.

C.    Retaliation by Termination

In the absence of direct evidence of retaliation in violation of Title VII, the Court applies the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980) (applying *McDonnell Douglas* burden-shifting analysis to retaliation claims). To prevail on her claim, Stuart must establish a *prima facie* case showing (1) she opposed a practice made unlawful by the statute, (2) her employer subsequently took adverse action against her, and (3) the adverse action was causally linked to the protected activity. *See Manning v. Metropolitan Life Ins. Co., Inc.*, 127 F.3d 686, 692 (8th Cir. 1997). If Stuart can establish her *prima facie* case, a "legal presumption of unlawful discrimination" exists. *See Ryther v. KARE 11*, 108 F.3d 832, 836 (8th Cir. 1997) (en banc) (applying *McDonnell Douglas* burden shifting analysis in an age discrimination case). "This presumption places an obligation upon the employer to produce evidence of a legitimate, nondiscriminatory reason for the plaintiff's discharge. If the employer carries this burden, the legal presumption of unlawful discrimination 'drops out of the picture.'" *Id.* (citation

-18-

omitted).  Stuart may still prevail if she can proffer evidence of pretext and disbelief of the defendant's explanation.  *See id.* at 837.  Merely disputing GMC's reason is insufficient, however.  Stuart "must show 'both that the reason was false, and that discrimination was the real reason.'" *Id.* at 838, n.5 (quoting *Hicks*, 509 U.S. at 515).

The Court notes that to prove Stuart engaged in a protected activity, she need not establish the conduct she opposed was in fact discriminatory.  *See Wentz v. Maryland Casualty* Co., 869 F.2d 1153, 1155 (8th Cir. 1989).  Rather, Stuart must demonstrate a good faith, reasonable belief that the underlying conduct violated the law.  *See id.*

Both parties concede Stuart filed a charge of discrimination and that she was terminated by GMC.  The key questions are whether there is a causal link between Stuart's filing a charge  and her termination, and if such a link exists, whether GMC's proffered reason for terminating Stuart is a pretext for unlawful discrimination.  Stuart argues the disciplinary actions which followed her initial complaint to Markovich about sexual discrimination establish a pattern of animosity pointing to a causal link.

To support her claim that a pattern of animosity existed, Stuart argues the disciplinary actions after her complaints in July 1996 reveal a growing discriminatory animus and her termination was the final step in a discipline track in which she was improperly placed following the filing of her grievance with Markovich on July 15, 1996.  This argument is unconvincing.  First, plaintiff does not deny the factual basis of three of the five instances of disciplinary action to which she was subject to between the filing of her complaints of discrimination and harassment with GMC and her termination.  Thus, there exists legitimate, non-retaliatory reasons for the three disciplinary actions.  Second, Stuart does not provide evidence that similarly situated workers were treated differently for the

same infractions.[18] Third, although Stuart denies the factual basis for the infractions of July 14 and July 18 which resulted in discipline for tardiness in returning from a break and insubordination, and Stuart alleges the discipline she received for those infractions was retaliatory, nearly six months elapsed between the allegedly retaliatory discipline and Stuart's termination. As discussed below, standing alone, it is doubtful a six month gap between a complaint and termination is sufficient to create an inference of retaliation. Fourth, the disciplinary action taken with respect to Barry and Stuart's alleged indecent act was consistent with GMC's past discipline for similar employees, Esther Dean and Elbert Moody, who were terminated for engaging in sex on the job. Indeed, as GMC fired Barry in addition to Stuart when Barry's next ordinary rule infraction would have merely resulted in a thirty day suspension, it appears GMC regarded what Stuart allegedly did to be such as severe infraction of its rules that it warranted immediate termination regardless of an employee's past disciplinary records. Thus, Stuart fails to show her disciplinary record establishes a pattern of animosity that resulted in her termination.

Additionally, Stuart contends the nearly six month period between filing her complaint and her termination in and of itself creates a causal connection. "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kiel v. Select Artificials, Inc.*, 169 F.2d 1131, 1136 (8th Cir. 1999) (en

---

[18]     The only evidence regarding unequal treatment Stuart proffers concerns Jim Burlingame (Burlingame). While Stuart does offer evidence showing improvement in her tardiness, she offers no evidence contradicting GMC's assertion that Burlingame's improvement was "marked" while hers was not. As far as Stuart's claim she was treated unequally because Dean and Moody, two GMC employees terminated for having sex on the job, were offered reinstatement, Stuart offers no evidence contradicting Thornley's testimony that he presented an offer to reinstate Stuart to Sam Markovich (Markovich), who refused it on Stuart's behalf.

banc), *cert. denied*, 120 S. Ct. 59 (1999). *See also, e.g., Feltman v. Sieben*, 108 F.3d 970, 977 (8th Cir. 1997) (in Title VII retaliatory discharge claim plaintiff fired six months after the complaint; without more, temporal proximity found to be insufficient to show causal link)[19]; *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1090 (8th Cir. 1992) (court doubtful causal connection is established when only evidence is notice of termination which occurred six months after reprimand for filing a complaint); *see also Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 989 (8th Cir. 1999) (standing alone, four months between charge and adverse action weakens inference of retaliation). *But cf. Bassett v. City of Minneapolis*, No. 99-1147, 2000 WL 371135, at *5 (8th Cir. April 12, 2000) (less than two months between charge and adverse action combined with pattern of increasing levels of discipline immediately following claims of discrimination sufficient to create causal connection). We decline, however, to determine whether temporal proximity alone would in this instance create an inference of a causal connection as Stuart's failure of proof[20] is even more obvious when we focus on the pretext

---

[19]    Similarly, in a cause of action for retaliatory discharge under Missouri law in the same case, the Court found where only six weeks had passed between report of forged checks and the plaintiff's discharge, temporal proximity alone was insufficient to establish a causal link between plaintiff's complaint and her discharge.

[20]    The only additional evidence Stuart offers consists of two sets of notes. One is a collection of handwritten notes allegedly stating, "we got [Stuart and Barry] like I said we would" and "[Stuart and Barry] will never be back." Stuart alleges these notes were written by Markovich and record comments made to him by North's supervisor, Steve Schwartz. The other collection consists of unattributed handwritten notes allegedly instructing security guards to detain Stuart when she returned to work on July 20 and search her for a gun. To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of FED. R. CIV. P. 56 (e). Documents which do not meet those requirements cannot be considered. *See Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir. 1980);

stage of the *McDonnell Douglas* inquiry.

Even assuming, *arguendo*, Stuart can establish a *prima facie* case, her claim would still fail as a matter of law because she cannot establish GMC's proffered reason for her termination is false and a pretext for retaliation. GMC proffers it terminated Stuart because she engaged in an indecent act on the job and such an act is so severe a violation of GMC's work rules that it warrants immediate termination regardless of an employee's prior disciplinary record. Stuart alleges GMC's reason is a pretext for retaliation because GMC knew she did not engage in an indecent act on the job but fired her anyway.

The Court is not persuaded by Stuart's assertions. Stuart was allegedly seen by an independent security guard, ignorant of Stuart's complaints of sexual harassment, engaging in a sex act with Barry. Stuart and Barry were identified from a series of photographs. The security guard's report was reviewed by Thornley who conducted an investigation of the incident and drafted a report. Thornley's report was relayed to Eastvold, who made the decision to terminate Stuart and Barry on that basis.

Stuart contends because she can demonstrate she did not engage in the indecent act, she raises a genuine issue of material fact whether the termination was based on a retaliatory motive. Based on Joellenbeck's testimony of January 14, 1999, a note by Joellenbeck to himself allegedly written on January 3, 1997, and North's testimony of November 11, 1999, regarding what time they recall Stuart being in North's office, Stuart asserts Thornley knew she was in North's

---

*accord Northwestern Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662 (7th Cir. 1994); *O'Bannon v. Union Pacific*, 960 F. Supp. 1411, 1418 (W.D. Mo. 1997). Stuart fails to offer any independent evidence authenticating these notes. Consequently, they will not be considered by the Court.

office while the incident was allegedly taking place.[21]  She also asserts Thornley omitted that information from the report he prepared and sent to Eastvold.  Stuart further claims Andrews is an unreliable witness because he was prejudiced against Stuart and because in a deposition he contradicted the account of the incident he wrote in his security report.  Stuart's denial of the facts upon which her termination was based, standing alone, however, is not evidence that GMC's stated reason was a pretext.  *See Dhyne,*184 F.3d at 989.  At the time all relevant decisions were made, Thornley appears to have been unaware[22] of Joellenbeck's belief that Stuart was in the North's office at 2:10 a.m., or that North believed Stuart was in North's office at approximately 2:10 a.m.  Thornley interviewed North and Joellenbeck and was told that Stuart came into North's office for a short time prior to her clocking out at 2:20 a.m. on January 2, 1997.  Thornley had no reason to doubt the accuracy of Andrews's report stating he saw two individuals, whom he later identified as Stuart and Barry, engaging in a sexual act.[23]  Based on

---

[21]  Stuart alleges Murphree was in North's office at the same time she was.  Despite repeating this allegation to Thornley, who later prepared the incident report, Stuart claims Thornley never interviewed Murphree.  Thornley testified he does not recall if he interviewed Murphree, and testified he did not get written statements from North and Murphree because he believed Andrews's written report was sufficient proof.  Stuart offers no evidence contradicting this testimony.

[22]  Stuart does not allege Joellenbeck or North ever told Thornley what time they believed Stuart was in North's office, she merely asserts based on their later testimony that Thornley must have been aware of their beliefs.  Stuart also does not address the significance Joellenbeck's note to himself, nor does Stuart claim he showed it to anyone prior to Stuart commencing the instant action.

[23]  This Court finds the fact Stuart testified she told Thornley that she saw Andrews rummaging through the parts-bin immediately prior to the time of the alleged indecent act does not raise a material question of fact regarding whether Thornley was motivated by retaliatory animus when preparing his report of the incident.

his investigation, Thornley concluded Stuart indeed engaged in a sexual act on the job and deserved to be terminated.

The core question in a retaliation case does not, ultimately, concern the veracity of the facts underlying an employer's legitimate non-discriminatory reason for discharging its employee, but rather concerns whether "the employment decision was based upon intentional discrimination." *Ryther*, 108 F.3d at 837-38; *see also Dhyne,*184 F.3d at 989. The wisdom of a company's decision to terminate its employee for what this Court may regard as a frivolous reason is not an issue in a Title VII case. *See Hill v. St. Louis Univ.*, 123 F.3d 1114, 1120 (8th Cir. 1997). Stuart has produced no evidence showing Thornley did not believe his report to be an accurate evaluation of what happened on the night in question and, therefore, fails to raise any questions of material fact regarding his intent or motive in preparing the report. Eastvold relied on Thornley's report and Eastvold did not posses any other evidence contradicting the accuracy of the report. Stuart has not provided any evidence showing otherwise. Because Stuart failed to produce sufficient evidence that could lead a factfinder to conclude GMC's decision to terminate plaintiff was a pretext for retaliation, Stuart's retaliation claim must fail as a matter of law. Consequently, this Court affirms the district court's grant of summary judgment to GMC on this claim as well.

D.    Discovery Rulings

Stuart argues the district court abused its discretion in refusing to compel the discovery of documents showing she was treated differently than similarly situated male co-workers and in refusing to compel GMC to provide the address of Miles. The district court held Stuart was grossly attempting to expand the scope of her charge and complaint with burdensome and irrelevant discovery requests. The district court also held that any discovery issues regarding disciplinary actions allegedly taken in retaliation were not properly before the Court and consequently, all requests regarding those claims would be denied. The Court also noted there

had been plenty of time within the discovery period to search for Miles's whereabouts.[24] Because the district court's conclusions regarding discovery are reasonable, this Court finds the district court did not abuse its discretion.

Because Stuart's claims under the MHRA are essentially the same as her Title VII claims, which must fail as a matter of law, this Court dismisses Stuart's MHRA claims as well. *See Tart*, 31 F.3d at 671 (MHRA guided by federal employment discrimination decisions which "'are applicable and authoritative under the MHRA'") (quoting *Lane v. Ground Round, Inc.*, 775 F. Supp. 1219, 1223 (E.D. Mo. 1991)). Finally, because we find all of Stuart's claims fail as a matter of law, we decline to address her arguments regarding punitive damages.

V. CONCLUSION

For the reasons stated above the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[24] GMC disclosed on August 24, 1998, that Andrews reported observing Stuart and John Barry engaging in an indecent act to Trish Miles (Miles), but it was not until January 5, 1999, ten days before the extended discovery deadline, that Stuart first expressed an interest in deposing Miles.