Christine M. BRENNEMAN, Plaintiff,

v.

FAMOUS DAVE'S OF AMERICA,
INC., and Dave Ryburn,
Defendants.

No. 4:04–CV–90001.

United States District Court,
S.D. Iowa,
Central Division.

Jan. 23, 2006.

Michael J Carroll, Babich Goldman Cashatt & Renzo PC, Danielle K Dixon, Brown Winick Graves Gross Baskerville Schoenebaum, James H Gilliam, Brown Winick Graves Gross Baskerville Schoenebaum, Des Moines, for Christine M Brenneman, Plaintiff.

Scott M Brennan, Davis Brown Koehn Shors & Roberts, Des Moines, Jodie F Friedman, Littler Mendelson PC, George Richard Wood, Littler Mendelson PC, Minneapolis, MN, for Famous Dave's of America, Inc, Dave Ryburn, Defendants.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PRATT, District Judge.

### I. INTRODUCTION

Christine Brenneman filed suit against the Defendants alleging that she was subject to a hostile work environment and retaliation, both in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Iowa Civil Rights Act, Iowa Code § 216 et seq. ("ICRA"). Brenneman also claims that she was subject to common law battery and wrongful discharge in violation of public policy under Iowa law. Before the Court is the Defendants' Motion for Summary Judgment (Clerk's No. 14). For the reasons discussed below, the motion is granted in part and denied in part.

### II. FACTS

Christine Brenneman ("Brenneman") began working for Famous Dave's of America, Inc. ("Famous Dave's"), on January 20, 2003.[1] Famous Dave's hired Brenneman to work as an assistant manager at a Famous Dave's restaurant located in West Des Moines, Iowa. Brenneman spent the first four to five weeks of her employment in training at a Famous Dave's restaurant in Lincoln, Nebraska. She began work at the West Des Moines location in the middle of February 2003.

Brenneman's supervisor at the West Des Moines restaurant was Dave Ryburn ("Ryburn"), the general manager of that location. Ryburn reported to Dave Henson ("Henson"), the area director. Brenneman's duties as an assistant manager included scheduling, assisting food servers in the bar area, and performing other tasks related to the restaurant's operations. Along with the rest of the management team, Brenneman was responsible

for enforcing Famous Dave's anti-harassment policy, on which she had received training at the Lincoln location. Pl.'s Statement of Material Facts in Dispute (Clerk's No. 23–4) ¶¶ 1–6; Defs.' Statement of Undisputed Material Facts (Clerk's No. 14) ¶¶ 1–7.

Brenneman asserts that Ryburn began to make sexual advances within one to two weeks after she began working under him. According to Brenneman's deposition testimony, Ryburn winked at her and blew kisses in her direction on a daily basis. Brenneman Dep. at 115. Brenneman testified to a specific instance that occurred on March 30, while she was on the phone with the other manager, when Ryburn blew kisses and winked at her. Brenneman Dep. at 125–26. He also slapped her on the buttocks on March 21 and March 30. *Id.* at 115, 125, 132–34. On one of those occasions, he said, "I'll see you later" as he slapped her buttocks. *Id.* Brenneman also stated that Ryburn pulled on her badge, which she wore attached to the front of her belt. The badge had an elastic cord, and Ryburn would pull it and let it snap back "[a]t least a couple times a day." *Id.* at 117–18. In his deposition, Ryburn denied touching Brenneman on the buttocks, stating that he touched her in the "hip area" while "trying to get behind her to get into the office." Ryburn Dep. at 35–36.

Brenneman's complaints about Ryburn also involve allegations of inappropriate comments. Brenneman testified that on March 28, Ryburn suggested that he conduct a review of Brenneman's work at her house, rather than at the restaurant, where reviews were customarily done. Brenneman Dep. at 121. Ryburn denied this incident in his deposition. Ryburn Dep. at 42. Brenneman also testified that on March 31, she asked Ryburn for an

---

1. All of the facts giving rise to this lawsuit occurred during 2003.

envelope because she needed to mail a book to Famous Dave's corporate office. Ryburn gave her an envelope, but it was too small for the book. When Brenneman told Ryburn that the book would not fit in the envelope, he responded that she should "pretend it was a condom and slip it on real soft." Brenneman Dep. at 121. Another incident occurred on April 1, when Brenneman was having a conversation with Lisa Bonar ("Bonar"), a server at the restaurant. Brenneman and Bonar were discussing how expensive their children's dental bills were, and they joked that they wished they could have sex or a date with Bonar's nice-looking dentist in exchange for payment of their bills. *Id.* at 128. Ryburn, overhearing their conversation, asked if they could make the same arrangement with him. *Id.* at 130–31. On another occasion, Ryburn told Brenneman he wanted to come to the restaurant after she closed it to go over his "expectations," a comment Brenneman interpreted as having sexual connotations. *Id.* at 137–39. And on April 5, Ryburn asked Brenneman how she was doing. Brenneman replied, "I'm fine." Ryburn then responded, "Mm-hmm, you are fine." *Id.* at 145. He then asked if she needed anything and slapped her on the buttocks. *Id.* Brenneman also testified to an incident in which she asked Ryburn if he could stab a customer's ticket for her, that is, put the ticket on the spindle for completed tickets. According to Brenneman, Ryburn replied, "I'd love to stab you." *Id.* at 147. Ryburn testified that these conversations involved jokes, that they never occurred, or that they did not have sexual connotations. Ryburn Dep. at 39, 42, 43, 46, 47.

Brenneman testified to other isolated instances of inappropriate behavior at the restaurant. Brenneman contends that one day when she was at work, Ryburn opened the door to the management team's shared office, and Brenneman observed Henson in the office looking at pornography on a laptop computer. Brenneman Dep. at 89. Ryburn stated in a deposition that he also saw the pornographic image on Henson's computer and that he "apologized several times" to Brenneman after closing the office door. Ryburn Dep. at 25. Brenneman asserts that another employee, Meredith Brewer, told Brenneman that Ryburn had also touched her inappropriately. Brenneman Dep. at 87.

Brenneman first reported Ryburn's behavior to Chuck LeCorgne ("LeCorgne"), the general manager of the Famous Dave's restaurant in Lincoln, Nebraska, where Brenneman had completed her training. LeCorgne visited the West Des Moines restaurant on April 2 in order to conduct a review of the restaurant, and Brenneman approached him and told him she wanted to speak with him. Pl.'s Statement of Material Facts ¶ 23; Defs.' Resp. to Pl.'s Statement of Material Facts ¶ 23; Brenneman Dep. at 151. LeCorgne agreed to meet Brenneman later that day at the Macaroni Grill restaurant, where Brenneman's husband worked. At Macaroni Grill, Brenneman told LeCorgne about Ryburn's inappropriate physical contact and comments. According to Brenneman, LeCorgne's response was that Ryburn and his wife had just had a baby, and "maybe [Ryburn] needed a little attention and he was looking in the wrong place." *Id.* at 158. Brenneman testified that LeCorgne also said to her. "Chris, you're a nice-looking lady. You are fun-loving, energetic, and he's probably attracted to you that way." *Id.* at 158. LeCorgne added that he was "there as a friend and not a representative of Famous Dave's." *Id.* According to Brenneman, LeCorgne told her to see if this had happened to anyone else, and he informed her that he would contact Famous Dave's human resources department for her. He also told Brenneman that Famous Dave's had a telephone hotline she could call. *Id.* LeCorgne stated in

a deposition that he advised Brenneman to discuss her concerns with Ryburn, and if she was not comfortable talking with Ryburn, to speak to Henson. LeCorgne Dep. at 15.

Brenneman also testified that, during her meeting with LeCorgne, she expressed concern to LeCorgne about the possibility of retaliation in the event that she reported Ryburn's behavior. She stated that another employee, Rob Vawter ("Vawter"), told her that Ryburn had put him on an undesirable shift due to a scheduling change that Vawter made. Brenneman Dep. at 160–61. Brenneman also noted that Bonar had told her that Ryburn had a tendency to rearrange employees' schedules or remove them from the schedule when he got angry with them. *Id.* at 172. After Brenneman spoke with LeCorgne, Ryburn continued to blow kisses and wink at her. *Id.* at 164–65.

On April 7, Brenneman called Famous Dave's telephone hotline for employees. The first time she called, nobody answered and she hung up the telephone. Brenneman then called again and left a message with her name and telephone number. *Id.* at 177–78. After making the telephone calls, Brenneman went to work and spoke with Vawter, a co-manager, about her concerns. Defs.' Statement of Undisputed Facts ¶ 11; Brenneman Dep. at 180. Vawter called Karen Schindler ("Schindler"), who worked in Famous Dave's human resources office in Minneapolis, and reported what Brenneman had told him. Schindler called Brenneman within five or ten minutes after she heard from Vawter. Brenneman described her interactions with Ryburn to Schindler. Brenneman Dep. at 183. According to Brenneman, Schindler replied that Ryburn's actions were "blatant sexual harassment." *Id.* at 221.

Ryburn was out of town the week of April 7, so Schindler traveled to the West Des Moines restaurant on April 14 to con-duct an investigation following his return. *Id.* at 187–88. Schindler told Brenneman not to go to work that day. On the morning of April 14, Schindler called Brenneman and asked her if she wanted to meet with Schindler and Ryburn to discuss the situation. When Brenneman learned that Schindler had not yet discussed the allegations with Ryburn, Brenneman informed Schindler that she would prefer that Schindler meet with Ryburn first. Brenneman testified that, on the morning of April 14, she had not thought about quitting work at Famous Dave's. But later that day, Brenneman spoke with Schindler again. According to Brenneman, Schindler told her that she had spoken with Ryburn, and that he had admitted to some of the allegations. Schindler asked Brenneman whether she would be willing to sit down with her and Ryburn in order to "do a new schedule and work things out." *Id.* at 195. Brenneman did not feel certain that the solution would be adequate to make her feel safe at work. That evening, Schindler called Brenneman again. Schindler told Brenneman that she wanted to resolve the situation. Schindler asked Brenneman if she still wanted to work at Famous Dave's, and Brenneman responded that she was not sure and wished to speak to her husband. *Id.* at 197. Schindler informed Brenneman that they could move her to a Famous Dave's restaurant in Des Moines, on Merle Hay Road. *Id.* at 208. Brenneman informed Schindler that she would call her the following morning, on April 15, to discuss the situation in more detail. Also on April 14, Brenneman's husband called Schindler. During that conversation, Schindler suggested that she could meet with Brenneman without Ryburn present.

On the morning of April 15, Schindler made several telephone calls to Brenneman and left messages, but Brenneman did not answer the calls or respond to the

messages. Brenneman stated in her deposition that she was not ready to speak to Schindler, and that she felt emotionally let down as a result of her conversations with Schindler on April 14 because the situation with Ryburn "wasn't taken care of." *Id.* at 204. That same day, Brenneman's lawyer, James Gilliam, called Matt Reed ("Reed"), the human resources director at Famous Dave's, and informed him that Brenneman had decided to resign. *Id.* at 209. Later that evening, Brenneman emailed a resignation letter to Reed. Reed responded on April 18 with an email inviting Brenneman to return to work at Famous Dave's if she wished. *Id.* at 216–19; Dep. Ex. 9.

On April 21, Ryburn sent Brenneman a letter apologizing for his behavior and inviting Brenneman to return to work. Ryburn's letter stated that he would "do everything possible to ensure you feel comfortable coming back to work at Famous Dave's." *Id.* at 230; Dep. Ex. 13. On April 24, Reed sent Brenneman a letter informing her that Famous Dave's had instructed Ryburn that he must refrain from engaging in inappropriate behavior in the workplace. The letter further stated: "Famous Dave's does not disclose to one employee the specific discipline it imposes on another employee, so we cannot advise you of the specific discipline Mr. Ryburn received." Dep. Ex. 14. Reed also invited Brenneman to return to work. Brenneman Dep. at 232; Dep. Ex. 14.

### III. PROCEEDINGS

Brenneman filed a Complaint (Clerk's No. 1) in this Court on January 2, 2004, alleging violations of Title VII, the ICRA, common law battery, and discharge in violation of public policy under Iowa law. Famous Dave's filed an Answer (Clerk's No. 6) on January 22, 2004. Famous Dave's filed this Motion for Summary Judgment on June 2, 2005 (Clerk's No. 14), and Brenneman filed a Resistance on Sep-

tember 7, 2005 (Clerk's No. 23). Famous Dave's filed a Reply brief on September 19, 2005 (Clerk's No. 26). The matter is fully submitted.

### IV. STANDARDS FOR SUMMARY JUDGMENT

In a motion for summary judgment the Court's task is to consider the evidence identified in the parties' moving and resistance papers. Viewing that evidence in the light most favorable to the nonmoving party, the Court must decide whether there is any material dispute of fact that requires a trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); 10A *Wright, Miller & Kane, Federal Practice and Procedure* § 2712 (3d ed.2005). If there is no genuine issue as to any material fact, the Court will determine whether the moving party is entitled to judgment as a matter of law. *Breeding v. Arthur J. Gallagher and Co.*, 164 F.3d 1151, 1156 (8th Cir.1999).

Employment actions are inherently fact based, and the Eighth Circuit has repeatedly cautioned that in employment cases, summary judgment should "seldom be granted... unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir.1998) (citations omitted); *see also Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minn. Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991) ("[s]ummary judgments should seldom be used in cases alleging employment discrimination")); *Hillebrand v. M-Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). This is because "inferences are often the basis of the claim ... and 'summary judgment should not be granted unless the evidence

could not support any reasonable inference' of discrimination." *Breeding,* 164 F.3d at 1156 (quoting *Lynn v. Deaconess Med. Ctr.—West Campus,* 160 F.3d 484, 486–87 (8th Cir.1998)).

This does not mean that summary judgment is never proper in employment cases. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also* Fed.R.Civ.P. 56(c); *Snow v. Ridgeview Med. Ctr.,* 128 F.3d 1201, 1205 (8th Cir.1997) (citing *Bialas v. Greyhound Lines, Inc.,* 59 F.3d 759, 762 (8th Cir.1995)); *Woodsmith Publ'g Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir. 1990). The moving party must establish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic,* 691 F.2d 405, 408 (8th Cir.1982).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *Celotex Corp.,* 477 U, 106 S.Ct. 2548.S. at 323; *Anderson,* 477 U.S. at 247, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c), (e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Finally, in considering a motion for summary judgment, the Court does not weigh the evidence or make credibility determinations. *See id.* at 255, 106 S.Ct. 2505. The Court only determines whether there are any disputed facts and, if so, whether those factual disputes are both genuine and material. *Id.* at 250, 106 S.Ct. 2505.

## V. LAW & ANALYSIS

### A. Counts I and II: Sexual Harassment Under Title VII and the Iowa Civil Rights Act

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Courts generally recognize two types of sexual harassment as actionable under Title VII:(1) sexual harassment that is linked to the grant or denial of an economic *quid pro quo,* and (2) sexual harassment that creates an intimidating, hostile, or offensive working environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In this case, Brenneman does not allege that any inappropriate behavior was linked to the grant or denial of an economic *quid pro quo.* The Court will therefore treat Bren-

neman's claim as a hostile work environment claim.

 Federal case law supplies the basic framework for deciding cases under the Iowa Civil Rights Act.[2] *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1380 (8th Cir. 1996) (citing *Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n,* 322 N.W.2d 293, 296 (Iowa 1982)). Iowa courts "traditionally turn to federal law for guidance in evaluating the ICRA," but "[f]ederal law ... is not controlling." *Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) (citations omitted). Neither party posits any separate legal arguments regarding Brenneman's ICRA claims. The Court will therefore analyze Brenneman's state and federal hostile work environment claims together.

 When considering whether a working environment is hostile, courts examine all of the circumstances surrounding the hostile environment claim. *Quick,* 90 F.3d at 1378. To make out a prima facie case of sexual harassment, Brenneman must show that: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper remedial action. *Wright v. Rolette County,* 417 F.3d 879, 884–85 (8th Cir.2005) (listing elements of sexual harassment claim in a section 1983 action and noting that the elements are the same in an action under Title VII); *Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir.1993). Here, the Defendants contend that Brenneman cannot prove that the harassment affected a term, condition, or privilege of her employment, or that Famous Dave's failed to take proper remedial steps. These elements are discussed below.

1. *Affected a term, condition, or privilege of employment*

Famous Dave's argues that the alleged harassment did not affect a term, condition, or privilege of Brenneman's employment. *See Quick,* 90 F.3d at 1377. "This factor means that the workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 1378 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The Supreme Court has held that the conduct must be severe or pervasive enough to create an objectively hostile work environment and the victim must have subjectively perceived the environment to be hostile or abusive. *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. Factors to consider include the frequency and severity of the conduct, whether it is physically threatening or humiliating (rather than a mere offensive utterance), and whether it unreasonably interferes with an employee's work performance. *Id.* at 23, 114 S.Ct. 367; *Quick,* 90 F.3d at 1378.

The Defendants cite a number of cases emphasizing the stringency of the "severe or pervasive" test. *See, e.g., LeGrand v. Area Res. for Cmty. and Human Servs.,* 394 F.3d 1098, 1102 (8th Cir.2005) (holding that priest's conduct was not severe or pervasive even though priest asked plaintiff to watch pornographic videos and "jerk off with him," grabbed plaintiff's buttocks, and attempted to kiss plaintiff); *Tuggle v.*

---

**2.** The ICRA provides: "It shall be an unfair or discriminatory practice for any ... [p]erson to ... discriminate in employment against any applicant for employment or any employee because of the age, race, creed, color, sex, national origin, religion, or disability of such applicant or employee...." Iowa Code § 216.6(1)(a).

*Mangan,* 348 F.3d 714, 722 (8th Cir.2003) (holding that supervisor's offensive comments did not poison workplace); *Ottman v. City of Independence, Mo.,* 341 F.3d 751, 760 (8th Cir.2003) (concluding that supervisor's belittling comments about women were not severe or pervasive); *Meriwether v. Caraustar Packaging Co.,* 326 F.3d 990, 993 (8th Cir.2003) (concluding that single incident did not constitute severe or pervasive conduct); *Alagna v. Smithville R–II Sch. Dist.,* 324 F.3d 975, 980 (8th Cir.2003) (concluding that co-worker's visits to plaintiff's office and declarations of love were not severe and pervasive); *Duncan v. Gen. Motors Corp.,* 300 F.3d 928, 934 (8th Cir.2002) (holding that offensive behavior did not create hostile work environment); *Stuart v. Gen. Motors Corp.,* 217 F.3d 621, 632–33 (8th Cir.2000) (observing that alleged harassment did not impact plaintiff's ability to perform her job); *Scusa v. Nestle U.S.A. Co., Inc.,* 181 F.3d 958, 967 (8th Cir.1999) (observing that plaintiff engaged in the same conduct she complained about). The Defendants also emphasize this Court's conclusion, following a bench trial, that harassment that occurred over a period of less than one month was not sufficiently pervasive to support a hostile work environment claim. *See Van Horn v. Specialized Support Servs., Inc.,* 241 F.Supp.2d 994, 1009 (S.D.Iowa 2003).

Brenneman argues that the alleged harassment by Ryburn was pervasive because it began shortly after she began working at Famous Dave's and continued, almost daily, for the duration of her employment. *See, e.g., Baker v. John Morrell & Co.,* 382 F.3d 816, 828–29 (8th Cir.2004) (upholding jury verdict for plaintiff where harassment continued uninterrupted for years); *Eich v. Bd. of Regents for Cent. Mo. State Univ.,* 350 F.3d 752, 759 (8th Cir.2003) (reversing trial court's decision setting aside jury verdict for plaintiff where harassing behavior occurred on al-most a daily basis over a period of seven years); *Beard v. Flying J, Inc.,* 266 F.3d 792, 798 (8th Cir.2001) (upholding jury verdict where plaintiff's supervisor subjected her to numerous incidents of sexual harassment over a three-week period); *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir.1998) (upholding jury verdict where co-worker's inappropriate touching and sexual innuendos were frequent and chronic); *Bales v. Wal–Mart Stores, Inc.,* 143 F.3d 1103, 1109 (8th Cir.1998) (upholding jury verdict where harassing conduct "began soon after [the plaintiff] started work ... and continued until shortly before her departure"); *Rorie v. United Parcel Serv., Inc.,* 151 F.3d 757, 762 (8th Cir. 1998) (reversing district court's grant of summary judgment to employer and stating: "we cannot say that a supervisor who pats a female employee on the back, brushes up against her, and tells her she smells good does not constitute sexual harassment as a matter of law"); *Hathaway v. Runyon,* 132 F.3d 1214, 1216 (8th Cir.1997) (reversing district court order overturning jury verdict where plaintiff was touched inappropriately twice by a co-worker, who then made suggestive noises at her after she rebuffed his advances). Brenneman argues that a reasonable jury could find that Ryburn's actions were physically threatening and humiliating.

At the outset, the Court notes that there are factual disputes about the precise nature and severity of Ryburn's conduct. For instance, Ryburn stated in his deposition that he did not slap Brenneman on the buttocks, as she alleges, but merely patted her hip in an attempt to pass behind her. Ryburn Dep. at 36–37. He also indicated that his comment, "Mm-hmm, you are fine," did not carry sexual connotations. Ryburn Dep. at 47. And, regarding Brenneman's allegation that Ryburn said he would like to "stab her," Ryburn stated that he actually said he would like to "stab

it," meaning the ticket. Ryburn Dep. at 34. For purposes of this summary judgment motion, the Court must construe the facts in Brenneman's favor. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. The question for the Court is "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252, 106 S.Ct. 2505.

▪ As the various cases cited by the parties illustrate, "[t]here is no bright line between sexual harassment and merely unpleasant conduct." *Hathaway*, 132 F.3d at 1221. Yet one of the cases, *Beard*, contained a harassment pattern remarkably similar to the allegations in this case. In *Beard*, the plaintiff was an assistant manager at a restaurant. The general manager of the restaurant, who was the plaintiff's supervisor, engaged in inappropriate behavior over a three-week period. The manager brushed his body against the plaintiff's breasts, rubbed a pair of cooking tongs across her breasts, and flicked a pen across her nipples. When the division manager for the restaurant chain learned of the allegations, he traveled to the location where the harassment occurred and conducted an investigation. After interviewing the plaintiff and her manager, the investigator issued a warning to the manager. The plaintiff initially indicated that she was satisfied with the outcome of the investigation, but changed her mind after she witnessed a lewd comment by the manager and learned that the manager had also acted inappropriately toward several of her female colleagues. The division manager conducted a second investigation and, after a brief suspension, reinstated the offending manager. The plaintiff quit her position immediately after learning the manager would be reinstated. *Beard*, 266 F.3d at 797.

A jury returned a verdict for the plaintiff on her hostile work environment claim, and the restaurant chain moved for judgment as a matter of law. In upholding the jury's verdict, the Eighth Circuit observed that a reasonable person could conclude that the plaintiff's working environment was sufficiently hostile to support her claim:

> [The plaintiff's] testimony indicated that over a three-week period she had been subjected to numerous incidents in which her breasts had been touched. A reasonable person could find that this was an environment sufficiently hostile to affect [her] working conditions. There was also ample evidence before the jury to show that Ms. Beard considered it to be a hostile environment, since she complained about the harassment and testified that she eventually left her job as a result of it.

*Id.* at 798. The Court recognizes that there are some differences between the facts in *Beard* and the allegations in the current case. For instance, the manager in *Beard* touched the plaintiff's breasts, while Brenneman alleges that her manager touched her buttocks. In *Beard*, the plaintiff initially indicated her belief that the situation had been resolved and changed her mind later, while Brenneman did not feel the situation was ever resolved. And finally, Brenneman alleges several instances of inappropriate comments by Ryburn, while the allegations in *Beard* mostly consisted of offensive touching.

▪ Despite these differences, the facts in *Beard* are so similar that it is the best precedent for the current case. Although the incidents in *Beard* only occurred over a three-week period, the Eighth Circuit concluded that a reasonable jury could find that the plaintiff's work environment was hostile. And in fact, a reasonable jury did conclude that the plaintiff's work environment was hostile. In Brenneman's case, it is particularly relevant that the alleged harassment began just one to two weeks

after she began working and continued throughout the duration of her employment, a period of approximately two months. Moreover, the harassment was instigated by her supervisor, increasing the probability that the situation would be an intimidating one. While the same conduct might not be considered sufficiently severe or pervasive to support a claim when spread over a long period of time, in this case the conduct pervaded Brenneman's entire working relationship with Famous Dave's. The Court concludes that Brenneman has alleged sufficient facts to establish that the harassment affected a term, condition, or privilege of her employment at Famous Dave's.

### 2. *Employer knew or should have known and failed to take remedial steps*

The last element of a prima facie claim of sexual harassment based on a hostile work environment is that the employer knew or should have known of the harassment and failed to take remedial steps. *Quick*, 90 F.3d at 1378. " 'Once an employer becomes aware of sexual harassment, it must promptly take remedial action which is reasonably calculated to end the harassment.' " *Tatum v. Ark. Dep't of Health*, 411 F.3d 955, 959 (8th Cir.2005) (quoting *Kopp*, 13 F.3d at 269). In a case of harassment by a supervisor, the plaintiff need not show that the employer knew or should have known of the harassment; an employer is vicariously liable for supervisory harassment if the employee has suffered a tangible employment action. *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir.2005). In cases of supervisory harassment where there has been no tangible employment action, the employer may assert the affirmative defense that: (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the plaintiff unreasonably failed to take

advantage of corrective opportunities provided by the employer or to avoid harm otherwise. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Cheshewalla*, 415 F.3d at 850. A supervisor is someone who has the power to take tangible employment actions against the victim, such as hiring, firing, demotion, or reassignment. *Cheshewalla*, 415 F.3d at 850–51. Because the parties agree that Ryburn was Brenneman's supervisor, the threshold question in this case is whether Brenneman suffered a tangible employment action. If so, Brenneman will have established this element of her claim. If not, Famous Dave's may assert the affirmative defense outlined in *Ellerth* and *Faragher*.

### a. *Did Brenneman suffer a tangible employment action?*

Brenneman argues that she was constructively discharged, and that her constructive discharge is a tangible employment action under the *Ellerth/Faragher* standard. The Supreme Court has held that constructive discharge is a tangible employment action for purposes of applying *Ellerth* and *Faragher*, but only when an official act underlies the constructive discharge. *Pa. State Police v. Suders*, 542 U.S. 129, 140–41, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004); *see also Jackson v. Ark. Dep't of Educ.*, 272 F.3d 1020, 1026 (8th Cir.2001), *cert. denied*, 536 U.S. 908, 122 S.Ct. 2366, 153 L.Ed.2d 186 (2002). Therefore, if Brenneman was subject to an official act that led to her constructive discharge, Famous Dave's may not take advantage of the affirmative defense outlined in *Ellerth* and *Faragher*.

Here, it does not appear that Ryburn's actions were tied to an official act.

In *Suders,* the Supreme Court used the example of a harassing supervisor who gives an employee a dangerous job assignment to retaliate for spurned sexual advances, thus forcing the employee to resign. *Suders,* 542 U.S. at 150, 124 S.Ct. 2342 (citing *Reed v. MBNA Marketing Sys., Inc.,* 333 F.3d 27, 33 (1st Cir.2003)). Under this scenario, the Court explained, the constructive discharge would be the result of an official act, precluding the employer from asserting the affirmative defense. *Id.* Here, Ryburn's actions were not tied to his official role as Brenneman's supervisor, and his actions toward Brenneman did not involve a direct exercise of company authority. *See id.* Therefore, any alleged constructive discharge that Brenneman suffered would not be sufficient to make Famous Dave's vicariously liable as a matter of law.

■ In any event, Brenneman has not asserted facts sufficient to prove a claim of constructive discharge. To establish constructive discharge, Brenneman must show "that the harassment was severe enough that a reasonable person in the same position would have found the working conditions intolerable." *Van Steenburgh v. Rival Co.,* 171 F.3d 1155, 1160 (8th Cir.1999). The Eighth Circuit has repeatedly stated that " '[a] constructive discharge occurs when an employee resigns after the employer has created an intolerable working environment in a deliberate attempt to compel such a resignation.' " *Davis v. KARK–TV, Inc.,* 421 F.3d 699, 706 (8th Cir.2005) (quoting *Tatum v. City of Berkeley,* 408 F.3d 543, 551 (8th Cir.2005)); *see also Suders,* 542 U.S. at 141, 124 S.Ct. 2342; *MacGregor v. Mallinckrodt, Inc.,* 373 F.3d 923, 928 (8th Cir. 2004). In the absence of clear intent, a plaintiff must show that her resignation " 'was a reasonably foreseeable consequence' " of the hostile environment. *Delph v. Dr. Pepper Bottling Co.,* 130 F.3d 349, 354 (8th Cir.1997) (quoting *Hukkanen*

*v. Int'l Union of Operating Eng'rs Local 101,* 3 F.3d 281, 285 (8th Cir.1993)). The Eighth Circuit has observed that " '[p]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst and not to jump to conclusions too fast.' " *West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 498 (8th Cir.1995) (quoting *Smith v. Goodyear Tire & Rubber Co.,* 895 F.2d 467, 473 (8th Cir.1990) (emphasis in original)). Thus, "[a]n employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged." *West,* 54 F.3d at 498.

■ Brenneman does not assert that Ryburn's actions were a deliberate attempt to compel her resignation; nor does she present any facts that would indicate that Famous Dave's sought to force her to quit. Moreover, Brenneman acknowledged receipt of letters from Ryburn and Reed, both inviting her to return to work. Brenneman Dep. at 230, 233; Def.'s Exs. 12, 13. The question, then, is whether Brenneman's resignation was a reasonably foreseeable consequence of the hostile environment under the circumstances. Given that Famous Dave's investigated Brenneman's complaint promptly and sought to work out a solution, Brenneman's sudden resignation, before discussing her options with Schindler in person, was not reasonably foreseeable. Even accepting Brenneman's contention that she thought the investigation had ended and she was unsatisfied with the outcome, there is nothing in the record to indicate that the work environment would have continued to be so intolerable that her resignation was foreseeable. The Court concludes that Brenneman cannot prevail in her contention that she was constructively discharged. *See West,* 54 F.3d at 498 (holding that employee was not constructively discharged when she resigned while her employer sought to satisfy her request for a transfer); *Shealy*

*v. Winston,* 929 F.2d 1009, 1013 (4th Cir. 1991) (affirming summary judgment for employer where employee retired before waiting to hear the details of a proposed position); *Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir.1987) (affirming district court's finding that plaintiff was not constructively discharged, where plaintiff resigned one day after returning from maternity leave without giving employer an opportunity to grant her a position similar to the one she had occupied before she left); *Raley v. Bd. of St. Mary's County Comm'rs,* 752 F.Supp. 1272, 1279 (D.Md.1990) (holding that there was no constructive discharge where plaintiff resigned while plan to transfer her was in motion).

b. *Does Famous Dave's qualify for the affirmative defense outlined in Ellerth and Faragher?*

 Because Brenneman did not suffer a tangible employment action, the Court next must examine whether Famous Dave's qualifies for the affirmative defense set forth in *Ellerth* and *Faragher.* The burden is on Famous Dave's to prove that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) Brenneman "unreasonably failed to take advantage of any preventive or corrective opportunities" provided by Famous Dave's, or "to avoid harm otherwise." *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. In examining this issue, the Court is mindful of the Supreme Court's statement that the primary objective of Title VII "is not to provide redress but to avoid harm." *Faragher,* 524 U.S. at 806, 118 S.Ct. 2275.

(1) *Did Famous Dave's exercise reasonable care to prevent and correct promptly any sexually harassing behavior?*

 The first question for the Court is whether Famous Dave's can prove that it exercised reasonable care to prevent and correct the alleged sexual harassment. Famous Dave's argues that it has in place an anti-harassment policy with specific information about how an employee may report a claim of harassment. *See* Def.'s Statement of Undisputed Material Facts, ¶ 2. Famous Dave's also argues that Brenneman received training about the policy. *See id.* at ¶ 5. Famous Dave's does not state whether Ryburn received similar training, an omission the Court considers significant considering that the first part of the affirmative defense asks whether the employer exercised reasonable care to *prevent* any sexual harassment. *See Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. Nonetheless, Famous Dave's had a sexual harassment policy in place, along with a reporting procedure.

The more difficult question is whether Famous Dave's exercised reasonable care to correct the harassing behavior once Brenneman reported it. According to Brenneman, she initially reported the harassment to LeCorgne on April 2, 2003, and LeCorgne did nothing. Then, on April 5, when Brenneman told Ryburn she was fine, Ryburn responded "Mm-hmm, you are fine," and, when asked whether he could stab Brenneman's ticket, Ryburn responded, "I'd love to stab you." Ryburn also continued to blow kisses and wink at Brenneman after she spoke with LeCorgne. Brenneman Dep. at 164–65. Approximately five days later, Brenneman spoke with Vawter about the harassment. The parties' submissions indicate that Vawter contacted Famous Dave's human resources office the same day that Brenneman spoke with him, and Schindler traveled to West Des Moines as soon as Ryburn returned from his vacation.

Schindler's investigation consisted of interviews with Brenneman, Ryburn, Vawter, and Brewer. Schindler Aff. at 1–6.

Schindler instructed Brenneman not to come to work while the investigation was underway. After conducting the interviews, Schindler offered to sit down with Brenneman to work out a new schedule. She also offered to transfer Brenneman to another location in Des Moines. As a result of the investigation, Famous Dave's issued a written warning to Ryburn and required him to apologize to Brenneman. Famous Dave's also required Ryburn to attend additional anti-harassment training.

 The Eighth Circuit's case law indicates that Famous Dave's did everything that was required of it under the circumstances. Factors to consider when assessing the reasonableness of an employer's measures to end harassment include the amount of time that elapsed between the notice of harassment and the remedial action, the options available to the employer, such as employee training sessions, disciplinary action taken against the harasser, and whether or not the measures ended the harassment.[3] *Stuart*, 217 F.3d at 633. The Eighth Circuit has never held that an employer must terminate or transfer an employee who is accused of harassment. For instance, in *Meriwether v. Caraustar Packaging Co.*, the Eighth Circuit affirmed the district court's grant of summary judgment to an employer who suspended the harassing employee for seven days, required him to undergo anti-harassment training, and issued him a warning, even though the plaintiff still had to work with him on occasion. *Meriwether*, 326 F.3d at 994. In another case, the employer investigated the harassment allegations, reprimanded the offending employee, and

placed him on probation for ninety days. The Eighth Circuit held that these actions were appropriate, observing that the law does not require the employer to fire the harassing employee. *Barrett v. Omaha Nat'l Bank*, 726 F.2d 424, 427 (8th Cir. 1984). And in *Jackson v. Arkansas Department of Education*, the court noted that the employer immediately investigated the employee's complaint, changed the plaintiff's hours, and instructed the alleged harasser not to have any more contact with the plaintiff. The court concluded that these actions were sufficient to satisfy the first part of the *Ellerth/Faragher* affirmative defense. *Jackson*, 272 F.3d at 1026.

Although LeCorgne's initial reaction to Brenneman's complaint was less than ideal, the parties' submissions reflect that Famous Dave's acted swiftly to correct the harassment when Brenneman reported it to Vawter just five days later. Brenneman indicates that she felt that Ryburn, rather than she, should have been asked to relocate.[4] But, even assuming that Brenneman's version of the events is true, and all Schindler offered was to rearrange her schedule or transfer her to another location, these solutions would have been acceptable. Given the undisputed facts in this case, no reasonable jury could conclude that Famous Dave's could not meet its burden of showing that it took reasonable steps to end the harassment.

*(2) Did Brenneman unreasonably fail to take advantage of preventive or corrective opportunities, or to avoid harm otherwise?*

 The second question the Court must consider is whether Brenneman un-

---

3. The Eighth Circuit has articulated these factors in cases of harassment by a co-worker, see *Stuart*, 217 F.3d at 633, but the factors are helpful in determining whether Famous Dave's took reasonable measures to correct any harassing behavior.

4. In her deposition, when asked what Ryburn could have done to resolve the situation, Brenneman replied, "[p]ossibly move to another store." When asked if there was "anything he could have done other than moving to another store," Brenneman replied, "No, I don't believe so." Brenneman Dep. at 193.

reasonably failed to take advantage of the corrective opportunities Famous Dave's offered. Famous Dave's contends that Schindler attempted to meet with Brenneman in order to resolve the situation, but that Brenneman unreasonably refused to meet with Schindler before resigning. Brenneman, on the other hand, asserts that Schindler indicated that she had completed her investigation, and Brenneman did not think that she would feel safe returning to work.

Famous Dave's cites *Jackson*, 272 F.3d at 1023, for the proposition that Brenneman's response to Famous Dave's remedial efforts was unreasonable. In *Jackson*, the Eighth Circuit examined a case where the plaintiff refused her employer's offer to schedule a meeting with her and her alleged harasser in an effort to remedy the situation. The court concluded that she had not taken advantage of the remedial measures offered by her employer, especially because the employer had made a point of checking in with her on a repeated basis to ensure the harassment had stopped. *Id.* at 1023; *see also Tutman v. WBBM–TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1049 (7th Cir.2000) (noting that plaintiff had not established he would be injured by his employer's proposed remedy); *McGowan v. Palmer House Hilton Hotel Co.*, 2000 WL 1222196, at *8 (N.D.Ill. Aug.24, 2000) (noting that it was not unreasonable for employee to feel apprehensive about returning to work, but it was unreasonable for her to quit without giving corrective measures an opportunity).

Here, Brenneman did not take advantage of the opportunity to meet either with Ryburn and Schindler or with Schindler alone. She refused Schindler's offer to discuss the possibilities of rearranging her schedule or transferring to a relatively nearby restaurant, choosing to resign instead. And, when asked why she didn't want to move to the location in Des Moines, Brenneman's only response was that she "didn't do anything wrong." Brenneman Dep. at 208. Moreover, Brenneman stated in her deposition that she did not know, at the time of her resignation, whether Famous Dave's might be willing to move Ryburn to another location, rather than moving Brenneman. Brenneman Dep. at 220. Brenneman also acknowledged in her deposition that she did not know whether she would have been safe returning to work because she never tried to return. *Id.* at 195.

 In analyzing this question, the Court takes seriously the principle that "[s]ummary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir.1998). Although Brenneman had a duty to take advantage of any remedial opportunities, Famous Dave's bears the burden of proving that she did not do so. *Suders*, 542 U.S. at 152, 124 S.Ct. 2342. As discussed above, the purpose of Title VII is to avoid harm, which is the reason an employer is afforded an opportunity to remedy any harm that has occurred. *See Faragher*, 524 U.S. at 806, 118 S.Ct. 2275. Thus, even if a jury found that Brenneman's work environment was sufficiently hostile to support her claim, the law affords Famous Dave's the opportunity to remedy that environment and requires that Brenneman take advantage of Famous Dave's remedial attempts. While it is true that Famous Dave's might have chosen to transfer Ryburn rather than offering Brenneman a transfer, it is not the Court's role to second guess an employer's business judgments. *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir.1995) (observing that "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments ... except to the extent those judgments in-

volve intentional discrimination.").[5] Here, the record leaves no doubt that Brenneman did not give Famous Dave's an opportunity to provide her with a harassment-free work environment following her complaint. The Court concludes that no reasonable jury could find for Brenneman on this element of her claim, notwithstanding the fact that Famous Dave's bears the burden on the affirmative defense. Summary judgment is therefore appropriate on Brenneman's hostile work environment claim.

### B. Counts III and IV: Retaliation in Violation of Title VII and the Iowa Civil Rights Act

Brenneman next argues that Famous Dave's retaliated against her in violation of Title VII and the ICRA after she reported Ryburn's harassment and hired a lawyer. Title VII and the ICRA both prohibit employers from discriminating against employees who allege that an employer has engaged in unlawful employment practices. *See* 42 U.S.C. § 2000e–3(a); Iowa Code § 216.11(2). As with Brenneman's hostile work environment claim, the Court will look to federal law in analyzing her state law retaliation claim. *See Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 836 (8th Cir.2002); *McElroy v. State,* 703 N.W.2d 385, 391 (Iowa 2005) (choosing to apply federal law when interpreting ICRA in the absence of briefing requesting a different approach).

Under the burden shifting framework established by the Supreme Court in *McDonnell Douglas Corporation v. Green,* a plaintiff who does not present direct evidence of retaliation must first demonstrate a prima facie case of retaliation. *McDonnell Douglas Corp. v. Green,* 411

U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Kasper v. Federated Mut. Ins. Co.,* 425 F.3d 496, 502 (8th Cir.2005). "If the plaintiff presents a prima facie case of retaliation, the burden shifts to the employer to rebut the plaintiff's prima facie case by articulating a legitimate, non-discriminatory reason for its adverse employment decision." *Kasper,* 425 F.3d at 502; *see McDonnell Douglas,* 411 U.S. at 803, 93 S.Ct. 1817. The burden then shifts back to the plaintiff to show that the employer's proffered reason was mere pretext. *Id.*

In order to demonstrate her prima facie case that Famous Dave's engaged in retaliation, Brenneman must prove that: (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. *Kasper,* 425 F.3d at 502; *Singletary v. Mo. Dep't of Corrections,* 423 F.3d 886, 892 (8th Cir. 2005). In this case, there is no question that Brenneman engaged in a protected activity by reporting Ryburn's actions. *See Singletary,* 423 F.3d at 892. But the only adverse employment action that Brenneman plausibly faced was constructive discharge, and, as discussed above, Brenneman has not presented facts that would permit a reasonable jury to conclude she was subject to a constructive discharge. The Court concludes that Brenneman cannot prevail on her retaliation claim.

### C. Count V: Battery Under Iowa Law

Brenneman next asserts that she was subject to battery when Ryburn slapped her on the buttocks and snapped the badge located on the front of her pants. Brenne-

---

5. The Eighth Circuit's model jury instructions are also instructive on this point: "You may not return a verdict for plaintiff just because you might disagree with defendant's [actions] or believe [them] to be harsh or unreasonable." Eighth Circuit Model Jury Instruction 5.94.

man's Complaint only seeks a judgment against Ryburn, not Famous Dave's, with respect to the battery claim.

■ Under Iowa law, battery may be proved in one of two ways. Under the first formulation, a plaintiff must prove that: (1) the actor intended to cause a harmful or offensive contact, or an imminent apprehension of such a contact, and (2) a harmful contact directly or indirectly resulted. *Nelson v. Winnebago Indus., Inc.,* 619 N.W.2d 385, 388 (Iowa 2000) (citing Restatement (Second) of Torts § 13 (1965)). Under the second formulation, a plaintiff must prove that: (1) the actor intended to cause a harmful or offensive contact, or an imminent apprehension of such a contact, and (2) an offensive contact directly or indirectly resulted. *Id.* (citing Restatement (Second) of Torts § 18(1)(1965)). The Iowa Supreme Court has explained that the second type of battery "does not require a physical injury ... 'a bodily contact is offensive if it offends a reasonable sense of personal dignity.'" *Id.* (quoting Restatement (Second) of Torts § 19 (1965)). The Iowa civil jury instruction for battery provides the following definition:

A battery is committed when a person intentionally does:

1. An act resulting in bodily contact causing physical pain or injury.

2. An act resulting in bodily contact which a reasonable person would deem insulting or offensive.

Iowa Civil Jury Instr.1900.4.

■ Brenneman asserts that Ryburn's acts—slapping her buttocks and snapping her badge—constituted battery because they resulted in bodily contact that a reasonable person would deem insulting or offensive. Ryburn, on the other hand, argues that Brenneman cannot prove that he intended to cause an offensive contact. A court in the Southern District of Iowa examined the intent ele-

ment in *Freeman v. Busch,* 199 F.Supp.2d 907, 914 (S.D.Iowa 2002), and concluded that "the actor's feelings toward the other person in initiating the conduct are immaterial; rather, the key issue is whether the other person has consented to the act." *Id.* (denying defendants' motion for summary judgment on battery claims where defendants raped and touched breasts of woman who was unconscious). The court relied on the Restatement (Second) of Torts, from which Iowa Civil Jury Instruction 1900.4 is derived. Under the Restatement, intent is established if the actor knows that the consequences (i.e. offensive contact) are certain, or substantially certain, to result from his act. Restatement (Second) of Torts § 8A. Likewise, the Comment to § 13 of the Restatement explains that the actor's feelings toward the other person are immaterial; the question is whether the other person has consented. *Id.* § 13 cmt. c. Ryburn points to *Bechen v. Francis,* 669 N.W.2d 262 (Table), 2003 WL 21464649, at *2 (Iowa Ct.App. June 25, 2003), where the court approved the trial court's observation that "[i]t is not true that every striking that occurs must, necessarily, be with the intent to cause physical pain or injury or to be insulting or offensive. If that were true, we would need only one element of the tort, not two." *Id.* (upholding jury's verdict for defendant). While it is true that intent is not established every time there is an offensive contact, in this case there appears to be at least a genuine issue of material fact about whether Ryburn intended the contact.

The Court must next consider whether the contacts with Brenneman's buttocks and badge are contacts that a reasonable person would find offensive. The Court does not believe that Ryburn's action in snapping Brenneman's badge, by itself, would be sufficient to support a claim for battery. Ryburn's alleged slaps to Bren-

neman's buttocks without her consent, on the other hand, were actions that a reasonable person could find offensive. Courts in Iowa and other jurisdictions have held, for nearly a century, that similar conduct constitutes battery. *See, e.g., Sellers v. Mineta*, 350 F.3d 706, 710 (8th Cir.2003) (discussing battery verdict based in part on incident where plaintiff's co-worker pinched her buttocks at work); *Wilson v. Taco Bell of Am., Inc.*, 2005 WL 3481480, at *2 (La.Ct.App.2005) (upholding battery verdict where defendant touched plaintiff's thighs and made grabbing motions at her buttocks and breasts); *Kelly v. County of Monmouth*, 380 N.J.Super. 552, 883 A.2d 411, 415 (2005) ("[A] non-consensual touching of a woman's breast or buttocks constitutes a battery."); *Reeves v. Reiman*, 523 N.W.2d 78, 82 (S.D.1994) ("If a male touches a female on her breasts or genitalia or buttocks or kisses her without her consent, he is subject to a civil action for battery regardless of how well intentioned."); *Smith v. Lannert*, 429 S.W.2d 8, 14 (Mo.Ct.App.1968) (observing that plaintiff could maintain action at common law where her supervisor spanked her at work); *Luttermann v. Romey*, 143 Iowa 233, 121 N.W. 1040, 1041 (Iowa 1909) (holding that plaintiff could recover for assault and battery if jury found that defendant patted her on the back, pinched her arm and breasts, and tickled her under the chin, so long as the contact was unwelcome). Here, Ryburn testified that he only touched Brenneman in the "hip area" while "trying to get behind her to get into the office." Ryburn Dep. at 35–36. This factual dispute is sufficient to defeat Ryburn's Motion for Summary Judgment on the battery claim.

### D. Discharge in Violation of Public Policy Under Iowa Law

■ Count VI of Brenneman's Complaint alleges that her consultation with an attorney resulted in her constructive discharge in violation of Iowa public policy.

The parties disagree about whether Famous Dave's learned before or after Brenneman's resignation that she had hired an attorney. But that factual dispute is immaterial, given that Brenneman's wrongful discharge claim is preempted by the ICRA. *See Smidt v. Porter*, 695 N.W.2d 9, 17 (Iowa 2005).

In *Smidt*, the Iowa Supreme Court examined whether a plaintiff who filed a discrimination claim under the ICRA could add a wrongful discharge claim to her lawsuit. The court explained that the ICRA is preemptive where a plaintiff's tort claim mirrors her ICRA claim: "To the extent the ICRA provides a remedy for a particular discriminatory practice, its procedure is exclusive and the claimant asserting that practice must pursue the remedy it affords." *Id.* Preemption applies unless the claims are " 'separate and independent, and therefore incidental, causes of action.' " *Id.* (quoting *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 858 (Iowa 2001)). The key inquiry is whether the operative facts giving rise to the ICRA claims are based upon the same conduct giving rise to the wrongful discharge claim. *Id.* (citing *Channon*, 629 N.W.2d at 857).

Here, Brenneman's wrongful discharge claim incorporates by reference the preceding allegations in her Complaint, including those allegations relating to her ICRA claims. Pl.'s Compl. ¶ 55. The crux of her wrongful discharge claim is her assertion that her "decision to consult an attorney concerning her employment-related civil rights was a motivating factor in her treatment by Defendant, Famous Dave's, which led to her constructive discharge." *Id.* at ¶ 57. Brenneman also alleges this fact in her ICRA retaliation claim. *See id.* at ¶ 48. Brenneman argues that the wrongful discharge claim is distinct from her ICRA claims because the

wrongful discharge claim does not require proof of discrimination. This distinction is untenable in light of the fact that one of Brenneman's ICRA claims was for retaliation, and the elements required to prove a prima facie case of retaliation under Title VII and the ICRA are nearly identical to the elements in a wrongful discharge claim. *Compare Kasper*, 425 F.3d at 502 (Title VII), *with Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 281 (Iowa 2000) (wrongful discharge). In any event, Brenneman's constructive discharge claim is no more likely to prevail under Iowa law than under Title VII. *See Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 642 (Iowa 2000) (explaining that state courts have followed federal courts in recognizing constructive discharge, and describing the requirements of a constructive discharge in the same way as federal courts); *see also Jeanes v. Allied Life Ins. Co.*, 300 F.3d 938, 943 (8th Cir.2002) (explaining that the test for constructive discharge is rigorous under Iowa law). The Court concludes that summary judgment for the defendants is appropriate on this claim.

## VI. CONCLUSION

The Defendants' Motion for Summary Judgment is GRANTED with respect to Brenneman's hostile work environment, retaliation, and wrongful discharge claims. The Defendants' Motion for Summary Judgment is DENIED with respect to Brenneman's claim for battery against Ryburn.

IT IS SO ORDERED.